**Robert DeMARTINO,
Appellant–Cross–Appellee,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee–Cross–Appellant.**

**No. 106, Docket 88–4048.**

United States Court of Appeals,
Second Circuit.

Argued Sept. 28, 1988.
Decided Nov. 23, 1988.

James C. Sherwood, New York City (Kostelanetz Ritholz Tigue & Fink, Jules Ritholz, David M. Kohane, New York City, of counsel), for appellant-cross-appellee.

Francis M. Allegra, Washington, D.C. (William S. Rose, Jr., Asst. Atty. Gen., Gary R. Allen, Chief, Appellate Section, Richard Farber, Kenneth L. Greene, Tax Div., Dept. of Justice, Washington, D.C., of counsel), for appellee-cross-appellant.

Before OAKES, MINER and ALTIMARI, Circuit Judges.

OAKES, Circuit Judge:

At least since *Gregory v. Helvering*, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the Internal Revenue Service and the courts have looked askance at transactions that are "sham" or lack a business purpose. *See* 6 J. Mertens, *Law of Federal Income Taxation* § 26.10 (1985). The taxpayer in this case, Robert DeMartino, would have us view otherwise the crude oil futures trading losses that he claimed in his 1975 tax year. The Tax Court, Jules G. Korner, III, Judge, held that the losses were not recognizable because the trades— "straddles"—were prearranged shams that took place in a thin market with unvarying straddle differentials and were not executed at free market prices. *DeMartino v. Commissioner*, 51 T.C.M. (CCH) 1278 (1986) (memorandum findings of fact and opinion).[1] It held that the taxpayer was not liable for additional interest under section 6621 [2] because a sham trade did not

---

1. This decision was summarily affirmed as to DeMartino's partner in *McDonnell v. Commissioner*, 862 F.2d 308 (3d Cir.1988).

2. Section 6621 provides that:
 In the case of interest payable under section 6601 with respect to any substantial underpayment attributable to tax motivated transactions, the rate of interest established under this section shall be 120 percent of the underpayment rate established [elsewhere in section 6621].

 26 U.S.C. § 6621(c)(1) (Supp. IV 1986) (as amended in 1986); *see also* 26 U.S.C. § 6621(d)(1) (Supp. III 1985) (substantially identical subsection that replaced subsection (c)(1) in 1984). Since 1984, it has also provided that:

 For purposes of this subsection, the term "tax motivated transaction" means—
 (i) any valuation overstatement (within the meaning of section 6659(c)),
 (ii) any loss disallowed by reason of section 465(a) and any credit disallowed under section 46(c)(8),

 (iii) any straddle (as defined in section 1092(c) without regard to subsections (d) and (e) of section 1092), and
 (iv) any use of an accounting method specified in regulations prescribed by the Secretary as a use which may result in a substantial distortion of income for any period.

 26 U.S.C. § 6621(d)(3)(A) (Supp. III 1985). In 1986, Congress added a fifth definition of the term "tax motivated transaction" in a "Clarification of Treatment of Sham or Fraudulent Transactions." The term now is also defined to mean "(v) any sham or fraudulent transaction." 26 U.S.C. § 6621(c)(3)(A) (Supp. IV 1986). The amendment adding subsection (v) "shall apply to interest accruing after December 31, 1984; except that such amendment shall not apply in the case of any underpayment with respect to which there was a final court decision before the date of the enactment [of the 1986 Act]." Pub.L. No. 99–514, § 1535(b), 100 Stat. 2085, 2750 (1986). See section C of this opinion for a discussion of the effect of this amendment.

meet the definition of "straddle" used by that section.[3] DeMartino was liable, however, for a 5% addition to the tax for negligence under section 6653(a).[4] Before the decision became final (Tax Court Rule 155 allows the parties to submit computations consistent with the court's decision), Congress passed section 1535(a) of the Tax Reform Act of 1986 and legislatively overruled the part of the decision that pertained to section 6621. Judge Korner then upheld the retroactive application of section 1535 of the 1986 Act in a supplemental opinion. *DeMartino v. Commissioner*, 88 T.C. 583 (1987) [available on WESTLAW, 1987 WL-49286]. We affirm the Tax Court's ultimate holdings.

## FACTS

In 1970 taxpayer Robert DeMartino, a long-time commodities trader, and Robert E. McDonnell formed Commodity International ("CI"), a partnership dealing in a broad range of commodities on all of the New York and Chicago exchanges and on certain London exchanges. CI was a member of the National Futures Association, was registered with the Commodity Futures Trading Commission ("CFTC"), and was a clearing member of the Commodity Clearing Corporation, which clears all trades on the New York Cotton Exchange ("NYCE"). The trades involved here were executed on behalf of CI at the NYCE between September 17, 1975, and January 21, 1976.

Commodity futures contracts are executory contracts representing commitments to deliver or receive a specified quantity and grade of a commodity during a specified month in the future at a price designated by the trading participants. One who commits to deliver pursuant to a futures contract is a "seller" and has a "short position" in the futures market, while one who commits to receive is a "buyer" and has a "long position" in the futures market. Trading of commodity futures contracts takes place in so-called trading pits or trading rings on the floor of the NYCE. The trades must take place by "open outcry," which involves vocal expressions and ritualized hand signals indicating the position, quantity, and price at which the floor broker or trader is willing to trade; this practice was vividly described in Frank Norris's *The Pit*, a 1903 novel about Chicago's grain market. Contracts do not remain bilateral between buyers and sellers. Once cleared, they exist only between the buyer or seller and the clearing house for the exchange, so that the clearing house stands as buyer to every seller and as seller to every buyer. Only a small percentage of futures contracts are satisfied by delivery. The bulk of them are terminated prior to delivery by offsets, that is, by the execution of an equal and opposite transaction.

A straddle, or spread, position is established by simultaneously holding a long position in one delivery month and a short position in another delivery month with respect to the same commodity. For example, if one buys a contract in March 1990

---

3. Section 6621 imposes additional interest for a straddle "as defined in section 1092(c)." 26 U.S.C. § 6621(c)(3)(A)(iii) (Supp. IV 1986). Section 1092(c) provides in pertinent part:

 Straddle Defined
 For purposes of this section—
 (1) In general
 The term "straddle" means offsetting positions with respect to personal property.
 (2) Offsetting Positions
 (A) In general
 A taxpayer holds offsetting positions with respect to personal property if there is a substantial diminution of the taxpayer's risk of loss from holding any position with respect to personal property by reason of his holding 1 or more other positions with respect to per-

sonal property (whether or not of the same kind).
26 U.S.C. § 1092(c) (1982). Judge Korner held that the taxpayer's transaction was not a section 1092(c) "straddle" because offsetting positions do not diminish risk in a sham.

4. The version of section 6653 that is applicable to tax liability for the 1975 tax year provided:
 If any part of any underpayment ... of any tax ... is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.
26 U.S.C. § 6653(a)(1) (1982), codified as amended at 26 U.S.C. § 6653(a)(1) (Supp. IV 1986).

crude oil and sells a contract in June 1990 crude oil, he establishes a straddle long March 1990 crude and short June 1990 crude. The two months are called the legs of the straddle. Profit or loss is based not on absolute price movements in the legs, but rather on the increase or decrease in the price differential between the long and the short contracts. Thus, if the short leg loses more value than the long leg gains, the differential changes and the value of the entire straddle position diminishes. By comparison, profit or loss on the trading of an "outright position"—solely short or long—is determined by the difference in price between the opening trade and the offsetting trade.

Open commodity futures positions are "marked to market" by the clearing house at the close of each trading day. This is done by comparing the actual prices paid for the futures contracts to settlement prices that the exchange fixes daily, and the market price is generally somewhere in the range of prices traded near the close of trading. Trading in commodity futures contracts has been regulated since April 1975 by the CFTC under the Commodity Futures Trading Commission Act of 1974, Pub.L. No. 93–463, 88 Stat. 1389, codified as per note following 7 U.S.C. § 2 (1982).

Trading of crude oil futures contracts at the NYCE began on September 10, 1974, and ended on July 2, 1976. A standard NYCE crude oil futures contract specified 5,000 barrels of crude oil for delivery at Rotterdam, Holland, and four delivery months were utilized—March, June, September and December. During the first month this market existed, only five contracts were traded. During the entire operation of the NYCE crude oil market only about 55,000 trades were executed, of which approximately 37,000 were straddle trades. There was virtually no trading in the nearby months in the crude oil market, unlike other commodity markets.

The rules covering trading in crude oil futures contracts at the NYCE provided that, with few exceptions, "[n]o transaction that is not made competitively by open outcry in the trading ring of the Exchange shall be permitted, reported or recorded in the records of transactions," Crude Oil By-Laws and Rules of the Petroleum Associates of the New York Cotton Exchange, Inc., Delivery Rule C14(5), and that "[m]isleading or ambiguous bids, offers or acceptances, as well as those of a frivolous nature, are strictly prohibited," *id.* Rule C14(6). The rules further provided for straddle trades:

> These orders are to be executed competitively by public outcry in the ring with at least one side of the straddle at the market price prevailing at the time of the trade. In inactive futures in which there are no prevailing market prices because there have been no trades, bids or offers in either future, the price must bear a reasonable relationship to the prevailing market prices of active futures.

*Id.* Rule C14(15). When a single broker had orders representing both sides of the same trade, the rules permitted him to place such orders only if they were "first offered openly and competitively by open outcry in the trading ring"; if "[n]either the future commission merchant receiving nor the member executing such orders [had] any interest therein, directly or indirectly, except as a fiduciary"; and if the broker met certain observation, reporting and recording requirements. *Id.* Rule C27.

CI engaged in two series of crude oil futures straddle trades in 1975 and 1976, the first a June 1977–December 1977 straddle and the second a December 1977–March 1978 straddle. The Tax Court found that all of the trades involved were pre-arranged outside of the trading ring in contravention of CFTC regulations. Joseph R. Hamilton, the broker who executed all of CI's trades, had so testifed. There was testimony to the contrary from one Norman Turkish, but the Tax Court found Turkish's testimony unreliable, especially in light of his conviction of tax evasion and conspiracy to defraud the United States, which resulted from his involvement in a conspiracy to fix commodity futures transactions in a similar tax deferment straddle scheme in the NYCE crude oil market. *See United States v. Turkish*, 623 F.2d 769 (2d

Cir.1980), *cert. denied,* 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

The Tax Court also found that the trades were not executed at free market prices because Hamilton, who was a broker for 98% of the trades executed in the NYCE crude oil market, testified that on several occasions he controlled the market and artificially moved prices downward. Some 67% of all the trades on the NYCE in the crude oil market were straddles. Almost all of the remaining trades were wash sales, purchases and sales of the same contract at the same time for the same price that resulted in no profit or loss to the trader. The wash sales apparently were made to inflate artificially the volume of contracts in order to make the market more attractive to investors. While the taxpayer argues that no one could have prevented outsiders from entering the market to capitalize on unrealistic prices, there was testimony from Hamilton that he moved market prices gradually in a successful effort to discourage outside investors from entering the. market.

Third, the Tax Court found that the differentials in CI's crude oil straddles stayed virtually the same throughout the entire life of the straddles. Both CI straddle differentials varied on only one day throughout the time the straddles were maintained, even though the prices in the legs of the straddles changed. The Tax Court found that Hamilton set the crude oil settlement prices and that it was important to make the prices of the legs of the straddles fluctuate, to achieve the desired tax results, while keeping the settlement prices making up the differential at a constant price, to avoid margin calls. Specifically, there was evidence that on the June 1977–December 1977 straddle, the price of each of the two legs of the straddle varied up to $2.49 while the straddle differential was a constant $.08 throughout the life of the straddle, except for September 23, 1975, when the differential was $.09. Similarly, the straddle differential for the December 1977–March 1978 straddle was the same on each day the straddle was maintained except for December 11, 1975. Because the differential did not change, CI's account equity remained at zero throughout the trading period, and it was not called upon to pay any maintenance margins.

Finally, the Tax Court found that the crude oil market was a "thin" market and that Hamilton was the only broker who was continuously in the crude oil ring. On the basis of these findings, the Tax Court concluded that these were sham transactions and that the losses sustained therein could not be recognized for federal tax purposes.

As a result of the trades, one CI house account lost $4,208,860 in 1975 and gained $4,091,035 in 1976 for a net crude oil futures transaction loss of $117,825. Another CI house account gained $57,500 in 1976. For all of its crude oil futures trading, CI was net out of pocket $60,125. On its 1975 partnership income tax return, it claimed a $4,208,860 short-term capital loss from crude oil futures, income of approximately $4,000,000 from other transactions, and a net loss of $286,293 for the year.

The Commissioner issued a notice of deficiency disallowing as sham the short-term capital loss claimed for 1975, and he eventually determined that CI had realized a short-term capital gain in excess of $4,000,-000, of which DeMartino's distributive share was $2,140,850. The Commissioner also asserted a tax for negligence or intentional disregard of the rules and regulations pursuant to section 6653(a) of the Code, *supra* note 4. Taxpayers then sought a redetermination of the deficiency in the Tax Court.

### DISCUSSION

#### A. *The Sham "Losses"*

 The primary issue in this appeal turns on section 165, the general loss provision of the Internal Revenue Code, and section 108(a)[5] of the Tax Reform Act of

---

**5.** The original version of section 108 of the Tax Reform Act provided as follows:

SEC. 108. TREATMENT OF CERTAIN LOSSES ON STRADDLES ENTERED INTO BE-

FORE EFFECTIVE DATE OF ECONOMIC RECOVERY TAX ACT OF 1981.

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1954, in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such position is part of a transaction entered into for profit.

(b) PRESUMPTION THAT TRANSACTION ENTERED INTO FOR PROFIT.—For purposes of subsection (a), any position held by a commodities dealer or any person regularly engaged in investing in regulated futures contracts shall be rebuttably presumed to be part of a transaction entered into for profit.

(c) NET LOSS ALLOWED WHETHER OR NOT TRANSACTION ENTERED INTO FOR PROFIT.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

(d) OTHER RULES.—Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of whether there is recognized gain or loss with respect to a position, and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle.

(e) STRADDLE.—For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1954 as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981, and shall include a straddle all the positions of which are regulated futures contracts.

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" has the meaning given to such term by section 1402(i)(2)(B) of the Internal Revenue Code of 1954 (as added by this subtitle).

(g) REGULATED FUTURES CONTRACTS.—For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1954 (as in effect before the date of enactment of this Act).

(h) SYNDICATES.—Subsection (b) shall not apply to any syndicate (as defined in section 1256(e)(3)(B) of the Internal Revenue Code of 1954).

Pub.L. No. 98–369, § 108, 98 Stat. 494, 630 (1984).

As amended in 1986, section 108 now provides:

(a) GENERAL RULE.—For purposes of the Internal Revenue Code of 1986 [formerly I.R.C. 1954], in the case of any disposition of 1 or more positions—

(1) which were entered into before 1982 and form part of a straddle, and

(2) to which the amendments made by title V of the Economic Recovery Tax Act of 1981 ... do not apply,

any loss from such disposition shall be allowed for the taxable year of the disposition if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business.

(b) LOSS INCURRED IN A TRADE OR BUSINESS.—For purposes of subsection (a), any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business.

(c) NET LOSS ALLOWED.—If any loss with respect to a position described in paragraphs (1) and (2) of subsection (a) is not allowable as a deduction (after applying subsections (a) and (b)), such loss shall be allowed in determining the gain or loss from dispositions of other positions in the straddle to the extent required to accurately reflect the taxpayer's net gain or loss from all positions in such straddle.

(d) OTHER RULES.—Except as otherwise provided in subsections (a) and (c) and in sections 1233 and 1234 of such Code, the determination of whether there is recognized gain or loss with respect to a position, and the amount and timing of such gain or loss, and the treatment of such gain or loss as long-term or short-term shall be made without regard to whether such position constitutes part of a straddle.

(e) STRADDLE.—For purposes of this section, the term "straddle" has the meaning given to such term by section 1092(c) of the Internal Revenue Code of 1986 as in effect on the day after the date of the enactment of the Economic Recovery Tax Act of 1981 [Aug. 13, 1981], and shall include a straddle all the positions of which are regulated futures contracts.

(f) COMMODITIES DEALER.—For purposes of this section, the term "commodities dealer" means any taxpayer who—

(1) at any time before January 1, 1982, was an individual described in section 1402(i)(2)(B) of the Internal Revenue Code of 1986 [formerly I.R.C. 1954] (as added by this subtitle), or

(2) was a member of the family (within the meaning of section 704(e)(3) of such Code) of an individual described in paragraph (1) to the extent such member engaged in commodities trading through an organization the members of which consisted solely of—

(A) 1 or more individuals described in paragraph (1), and

1984, which governs the deductibility of losses from commodity straddles claimed for tax years prior to 1982. The basic rule of law is that taxation is based upon substance, not form. *Gregory v. Helvering*, 293 U.S. at 469–70, 55 S.Ct. at 267–68; *Knetsch v. United States*, 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960); *Gilbert v. Commissioner*, 262 F.2d 512, 513 (2d Cir.), *cert. denied*, 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); Treas. Reg. § 1.165–1(b) (as amended in 1977) ("Only a bona fide loss is allowable. Substance and not mere form shall govern in determining a deductible loss."); *see also* 7 J. Mertens, *supra*, § 28.26. Losses resulting from sham transactions, therefore, are not deductible under section 165 of the Code. *Forseth v. Commissioner*, 845 F.2d 746, 748 (7th Cir.1988); *see also Higgins v. Smith*, 308 U.S. 473, 476–78, 60 S.Ct. 355, 357–58, 84 L.Ed. 406 (1940) (discussing section that was predecessor to section 165). A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions. *Sochin v. Commissioner*, 843 F.2d 351, 354 (9th Cir.) (sham losses from investments in straddles in forward contracts to buy and sell "Ginnie Maes" and "Freddie Macs"), *cert. denied*, — U.S. —, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988); *Goldstein v. Commissioner*, 364 F.2d 734, 741–42 (2d Cir.1966) (interest deduction disallowed where transaction had no substance or purpose aside from taxpayer's desire to obtain tax benefit of interest deduction), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed. 2d 543 (1967); *Barnett v. Commissioner*, 364 F.2d 742 (2d Cir.1966) (per curiam) (interest deduction disallowed where transaction was sham), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967).

■ The taxpayer argues first that the transactions were not sham. The Commissioner's findings were presumptively correct and the burden was on the taxpayer to demonstrate that the purported trades were bona fide. *See Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Schaffer v. Commissioner*, 779 F.2d 849, 857 (2d Cir.1985). The Tax Court found that the taxpayer had failed to meet this burden and that the commodity straddles were prearranged, contrived transactions conducted in a market rigged to produce tax losses. We cannot reverse these findings unless they were clearly erroneous. *Sochin*, 843 F.2d at 355; *Bail Bonds by Marvin Nelson, Inc. v. Commissioner*, 820 F.2d 1543, 1548 (9th Cir.1987). Here, the Tax Court's conclusions were supported by the evidence, because the NYCE crude oil market was clearly rigged. *See Turkish, supra; Lasker v. Bear, Stearns & Co.*, 757 F.2d 15, 17 (2d Cir.1985); *Sundheimer v. Commodity Futures Trading Commission*, 688 F.2d 150, 151 (2d Cir.1982), *cert. denied*, 460 U.S. 1022, 103 S.Ct. 1273, 75 L.Ed.2d 494 (1983). There simply is no need to recount further the ample evidence that indicated that there was no economic substance to the crude oil straddles.

■ The taxpayer's more persuasive argument is based on section 108 of the 1984 Tax Reform Act, *supra* note 5. In 1984, section 108 created a rebuttable presumption that the pre–1982 straddle trading losses of commodities dealers and those who regularly invested in commodity contracts were incurred in transactions engaged in for profit and thus were deductible. The taxpayer argues, however, that the Service saw the rebuttable presumption as an invitation to rebut and litigation continued. In

(B) 1 or more members of the families (as so defined) of such individuals.

(g) REGULATED FUTURES CONTRACTS. —For purposes of this section, the term "regulated futures contracts" has the meaning given to such term by section 1256(b) of the Internal Revenue Code of 1986 (as in effect before the date of enactment of this Act [July 18, 1984].

(h) SYNDICATES.—For purposes of this section, any loss incurred by a person (other than a commodities dealer) with respect to an interest in a syndicate (within the meaning of section 1256(e)(3)(B) of the Internal Revenue Code of 1986 [formerly I.R.C. 1954] ) shall not be considered to be a loss incurred in a trade or business.

Section 108 of Pub.L. No. 98–369, as amended by Pub.L. No. 99–514, § 1808(d), 100 Stat. 2085, 2817 (1986), reprinted at 26 U.S.C. § 1092 note (Supp. IV 1986).

section 1808(d) of the Tax Reform Act of 1986, Congress amended section 108 to provide that "any loss incurred by a commodities dealer in the trading of commodities shall be treated as a loss incurred in a trade or business" and as such an allowable deduction. Congress removed from section 108 the provision that a straddle loss should be allowed "if such position is part of a transaction entered into for profit" and inserted instead the words "if such loss is incurred in a trade or business, or if such loss is incurred in a transaction entered into for profit though not connected with a trade or business."

The words of the statute are so unambiguous, according to the taxpayer, that it is inappropriate to resort to the legislative history to interpret the statute. *See Miller v. Commissioner,* 836 F.2d 1274, 1282 (10th Cir.1988). Because CI was a commodities dealer within the meaning of the statute, was actively engaged in trading regulated futures contracts, and had registered with several commodities exchanges, the taxpayer argues, his share of the CI trading losses must be deemed incurred in a trade or business. Moreover, these trades did take place, because purchases and sales were cleared with the clearing corporation, and CI lost real money. Finally, the taxpayer suggests, even the legislative history provides some support for his interpretation: the House and Conference Committee reports on section 1808(d) confirm that the bill grants relief to "any position disposed of by [a dealer]." H.R.Rep. No. 99–426, 99th Cong., 1st Sess. 911 (1985), *reprinted in* 1986–3 C.B. (Vol. 2) [hereinafter H.R.Rep. No. 99–426]; H.R. Conf.Rep. No. 99–841, 99th Cong., 2d Sess. 845 (1986), *reprinted in* 1986–3 C.B. (Vol. 4) *and in* 1986 U.S.Code Cong. & Admin. News pp. 4075, 4933 [hereinafter H.R.Conf. Rep. No. 99–841].

On the other hand, the same House Report stated that the per se deductibility of section 1808(d) would not apply "where the trades were fictitious, prearranged, or otherwise in violation of the rules of the exchange." H.R.Rep. No. 99–426 at 911. The amendment was intended to overrule the sharply divided Tax Court's decision in

*Miller v. Commissioner,* 84 T.C. 827 (1985) [1985 WL 15347] *rev'd,* 836 F.2d 1274 (10th Cir.1988). H.R.Rep. No. 99–426 at 911. In *Miller,* the Tax Court held that a taxpayer had satisfied the original section 108(a) profit motive test by demonstrating that he had a prospect of deriving *any* profit from the transaction. The 1986 amendment harmonized the language of section 108(a) with the language of section 165 of the Code to respond to the Tax Court's decision in *Miller:* Congress eliminated the profit motive inquiry in cases involving dealers because of the inherent difficulty involved in making such an inquiry, but it did not prevent inquiry into the economic substance of a dealer's commodity trading.

We agree with the Commissioner that it is appropriate to apply here the basic rule of statutory interpretation that a statute should not be interpreted to produce an absurd or unreasonable result. *Haggar Co. v. Helvering,* 308 U.S. 389, 394, 60 S.Ct. 337, 339–40, 84 L.Ed. 340 (1940). Moreover, the taxpayer's argument ignores the opening clause of section 108(b), "[f]or purposes of subsection (a)," which makes the presumption of section 108(b) applicable only when section 108(a) applies to the transaction. Section 108(a) does not apply to straddle transactions that are shams. *Sochin,* 843 F.2d at 353 n. 6; *Enrici v. Commissioner,* 813 F.2d 293, 295 n. 1 (9th Cir.1987); *Mahoney v. Commissioner,* 808 F.2d 1219, 1219–20 (6th Cir.1987); *see also Forseth,* 845 F.2d at 748. Thus, since section 108(a) has no application here, neither has section 108(b).

B. *The Taxpayer's Liability for 5% Addition to Tax Upon Underpayment Due to "Negligence or Intentional Disregard of Rules and Regulations"*

██ Under section 6653(a) of the Internal Revenue Code, *supra* note 4, a taxpayer's "negligence or intentional disregard of rules and regulations" exposes him to a penalty of 5% of the underpayment. *See Neely v. United States,* 775 F.2d 1092, 1095 (9th Cir.1985); *Marcello v. Commissioner,* 380 F.2d 499, 506 (5th Cir.1967),

*cert. denied,* 389 U.S. 1044, 88 S.Ct. 787, 19 L.Ed.2d 835 (1968). The Tax Court's finding that the taxpayer was at least negligent is thoroughly supported in the record: there was testimony by the broker, Hamilton, that he met with the taxpayer, the taxpayer's partner, and Turkish, and that they discussed the use of crude oil futures straddles to produce artificial tax losses. Turkish's assistant, Alfred Perlmutter, also testified that he had conversations to this effect with the taxpayer's partner and Turkish. Finally, the trading records showed such a lack of movement in the straddle differentials that the taxpayer, a long-time professional commodity trader, must have known what was going on.

## C. *The Retroactive Application of Section 6621 of the Internal Revenue Code, as Amended*

■ For certain types of underpayments listed in section 6621, *supra* note 2, interest is calculated at 120% of the usual rate of interest. This occurs when a "substantial underpayment" of tax is "attributable to tax motivated transactions." The statute has always listed straddles as "tax motivated transactions," but, as previously noted, Judge Korner originally held that section 6621 was inapplicable to DeMartino. He held that DeMartino's straddles didn't meet the technical definition of "straddle" *because* they were sham. The Tax Reform Act of 1986 added shams to the list of tax motivated transactions,[6] and Congress indisputably intended to make the amendment retroactive. The Conference Committee Report named Judge Korner's first opinion in this case and *Forseth v. Commissioner,* 50 T.C.M. (CCH) 111 (1985), in which the Tax Court had also held that section 6621 did not apply to sham transactions, and the Report stated that "the intent of the conferees [was] to reverse the holding of these Tax Court cases on this issue." H.R.Conf.Rep. No. 99–841 at 796, 1986 U.S.Code Cong. & Admin.News p. 4884. The Tax Court applied the amendment on motion of the Commissioner.

Its application, the taxpayer argues, gives effect to an unconstitutional congressional assumption of judicial power and unconstitutionally imposes a retroactive penalty. First, relying on *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803), and *United States v. Klein,* 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), as well as a passage in *United States v. Sioux Nation of Indians,* 448 U.S. 371, 398, 100 S.Ct. 2716, 2732, 65 L.Ed.2d 844 (1980) (quoting *Nock v. United States,* 2 Ct.Cl. 451, 457–58 (1867)), which said that "the Constitution has invested Congress with no judicial powers," the taxpayer argues that Congress here invaded the judicial power.

We approve the Tax Court's application of the penalty. One can certainly agree with the conferees that the Tax Court's holdings in *Forseth* and the original *DeMartino* were "anomalous" in that "a genuine transaction (lacking the proper profit motive) would be subject to a higher interest rate, while a sham transaction, which is significantly more abusive, would escape the higher interest rate simply because it is a sham." *See* H.R.Conf.Rep. No. 99–841 at 796, 1986 U.S.Code Cong. & Admin.News p. 4884. Beyond this, Congress added sham or fraudulent transactions to the list of transactions subject to the higher interest rate regardless of the taxpayer's identity. Congress did not simply aim its arrow of increased interest penalty at the individual taxpayers in *Forseth* and *DeMartino,* and it indicated that the clarification did not apply "to any ûnderpayment with respect to which there was a final court decision (either through exhausting all appeals rights or the lapsing of the time period within which an appeal must be pursued) before the date of enactment of this Act." *Id.* Here, no final decision had been entered under the Tax Court rules, so application of the amendment was proper. *See Temple Univ. v. United States,* 769 F.2d 126, 134 n. 4 (3d Cir.1985) (no separation of powers violation where "Congress did not desire to effect a rule of decision only in a particular case"), *cert. denied,* 476 U.S. 1182, 106 S.Ct. 2914, 91 L.Ed.2d 544 (1986).

**6.** *See* note 2, *supra.*

That the legislation was retroactive does not make it unconstitutional. *Pension Benefit Guar. Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 729, 104 S.Ct. 2709, 2717, 81 L.Ed.2d 601 (1984) ("[R]etroactive application of a statute ... supported by a legitimate. legislative purpose furthered by rational means" is proper in the economic field.). Indeed, tax legislation has regularly been upheld even though it contained elements of retroactivity. *United States v. Darusmont,* 449 U.S. 292, 296–300, 101 S.Ct. 549, 551–54, 66 L.Ed.2d 513 (1981) (per curiam); *Welch v. Henry,* 305 U.S. 134, 146–50, 59 S.Ct. 121, 125–27, 83 L.Ed. 87 (1938); *Milliken v. United States,* 283 U.S. 15, 20–24, 51 S.Ct. 324, 326–28, 75 L.Ed. 809 (1931). Only where the retroactive application is "so harsh and oppressive as to transgress the constitutional limitation," *Welch v. Henry,* 305 U.S. at 147, 59 S.Ct. at 126, may such a statute be found to violate due process. We agree with the Commissioner that Congress intended simply to avoid giving sham taxpayers a windfall that they otherwise would have obtained from an anomalous decision of the Tax Court. *See generally* Hochman, *The Supreme Court and the Constitutionality of Retroactive Legislation,* 73 Harv.L. Rev. 692, 706–11 (1960).

Nor was the 1986 amendment violative of the ex post facto clause of the Constitution, as this is a civil, not a criminal case. *Harisiades v. Shaughnessy,* 342 U.S. 580, 594–95, 72 S.Ct. 512, 521–22, 96 L.Ed. 586 (1952); *Helvering v. Mitchell,* 303 U.S. 391, 401, 404–05, 58 S.Ct. 630, 635–36, 82 L.Ed. 917 (1938) (upholding, as civil penalty, a 50% additional tax imposed where payment was deficient due to intentional fraud). This is simply not so punitive as to be criminal either in purpose or effect, *see United States v. Ward,* 448 U.S. 242, 248–49, 100 S.Ct. 2636, 2641–42, 65 L.Ed.2d 742 (1980), particularly because we are increasing an interest rate rather than the tax liability itself. Thus, 120% of a 10% interest rate is only 12%, or an additional 2% penalty.

JUDGMENT AFFIRMED.