WILLIAM AND GEORGEANE S. POPLAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Poplar v. Commissioner
Docket No. 19346-88
United States Tax Court
T.C. Memo 1995-337; 1995 Tax Ct. Memo LEXIS 343; 70 T.C.M. (CCH) 168; July 26, 1995, Filed *343 Decision will be entered under Rule 155. For petitioners: Gino Pulito. For respondent: John Aletta. ARMEN
ARMEN
MEMORANDUM FINDINGS OF FACT AND OPINION ARMEN, Special Trial Judge: This case was heard pursuant to the provisions of section 7443A(b) and Rules 180 et seq. [1]
Respondent determined deficiencies in, and additions to, petitioners' Federal income taxes for the taxable years 1980, 1981, and 1983 as follows: Additions to Tax
Sec. Sec. Sec. Sec. Year
Deficiency
6653(a) 6653(a)(1)
6653(a)(2)
6659(a) 1980
$ 4,800.00
$ 240
--  --
$ 1,440.00
1981
4,230.42
--
$ 211.53
[1]
1,269.16
1983
2,837.70
--
141.89
[2]
851.31
*344 Respondent also determined that petitioners are liable for the increased rate of interest under section 6621(c), formerly section 6621(d), for each of the taxable years in issue. Petitioners have conceded the deficiencies in income taxes. Accordingly, the only issues for decision are whether petitioners are liable for: (1) Additions to tax for negligence under sections 6653(a), 6653(a)(1), and 6653(a)(2); (2) additions to tax for a valuation overstatement under section 6659(a); and (3) the increased rate of interest under section 6621(c). FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. At the time that the petition was filed, petitioners resided in Amherst, Ohio. By Order dated January 11, 1994, the Court granted respondent's motion for sanctions and imposed sanctions on petitioners under Rule 104(c). The Court took this action because of petitioners' failure to comply with the Court's Order dated November 29, 1993, granting respondent's motion to compel responses to respondent's interrogatories and directing petitioners to provide answers to said interrogatories. [2] Therefore, only extremely limited testimony was offered by petitioners at trial, *345 and our record is limited to that testimony, to the Stipulation of Facts (and the exhibits attached thereto), to respondent's expert witness report, and to the testimony of respondent's expert witness. Petitioner William Poplar (petitioner) obtained a bachelor's degree from Ohio State University and an MBA from the University of Dayton. During 1983, petitioner was employed as an engineer. During that same year, petitioner Georgeane S. Poplar was employed as a school teacher. Prior to December 23, 1983, petitioners entered into a joint venture with John and Margaret Petrasek, using the name Petrasek & Poplar Joint Venture. Saxon Energy Corporation (Saxon) was a corporation formed in 1981 to lease energy management systems to the public. See Schillinger v. Commissioner, T.C. Memo. 1990-640, *346 affd. per order 1 F.3d 954 (9th Cir. 1993)(discussing the Saxon Energy program in some detail). Petitioners obtained no documents pertaining to their prospective Saxon investment [3] from anyone other than Thomas A. Graham (Graham) of Graham & Associates, Inc. (Graham & Associates). The documents received from Graham by petitioners included a document entitled "Frequently Asked Questions About the Energy Brain/Fuel Optimiser Equipment Leasing Program" and another document entitled "Saxon Energy Corp. Energy Brain/Fuel Optimiser Equipment Leasing Program Information Memorandum" (the Information Memorandum). Both documents contained limited information regarding the energy management systems and a comparatively extensive amount of information regarding the potentially favorable tax consequences of leasing such a system. On December 23, 1983, petitioner completed a document entitled "Lessee's Qualification Questionnaire". On *347 that same date, Graham completed a document entitled "Business Advisor's Questionnaire". An Agreement of Lease (the lease) was entered into on December 23, 1983, between petitioners as lessees and Saxon as lessor, for a one-half interest in an Energy Brain/Fuel Optimiser System A-1 (the Energy Brain System), an energy management device. The term of the lease was 20 years. The other one-half interest in the Energy Brain System was leased by John and Margaret Petrasek. Under the terms of the lease, petitioners were required to pay, and did in fact pay, an advanced guaranteed rental for the period December 31, 1983 through December 31, 1984 in the amount of $ 6,750 for their one-half interest in the Energy Brain System. Afterwards, a document entitled "Election to Pass Investment Tax Credits from Lessor to Lessee" was executed by petitioners. This document was not signed by any Saxon representative. A Certificate of Insurance for the Petrasek & Poplar Joint Venture's Energy Brain System named Saxon as the insured. The policy expiration date was December 1, 1984. Petitioners also received an insurance binder for the Energy Brain System which reflected coverage on their investment through *348 December 1, 1984. Petitioners never intended to use the Energy Brain System themselves. Instead, petitioners were to engage a management company, which would locate an end-user. The end-user would pay for the Energy Brain System by splitting the amount of energy savings with petitioners. The management company was to retain a fee of 15 percent of petitioners' share of the energy savings and remit the balance to petitioners. Petitioners were then required to pay Saxon 75 percent of the remaining net income. Susan Haselhorst (Ms. Haselhorst) is an expert in the fields of energy management systems, design engineering evaluation methods, and energy system modeling. She prepared a study for respondent entitled "An Assessment of the Fair Market Value and the Profit Potential of the Energy Brain 1983A, 1 through 4" (the Study). The preparation of the Study took 120 hours and utilized four experts who hold degrees in areas such as engineering and accounting. The cost of conducting the Study was approximately $ 15,000. In evaluating the fair market value and the profit potential of the Energy Brain System, Ms. Haselhorst considered, among other things, the Information Memorandum and other *349 promotional literature, the terms of the lease entered into by petitioners and Saxon, and publicly available trade catalogues and magazines. She also had an opportunity to examine an Energy Brain/Fuel Optimiser System A-1, as well as energy management systems being marketed by other companies. On the basis of the Study, Ms. Haselhorst concluded that the fair market value of the Energy Brain System did not exceed $ 795. She also concluded, on the basis of the Study, that over a 10-year period an individual leasing the Energy Brain System would incur an economic loss of $ 50,000. Petitioners do not dispute these conclusions. We think the conclusions are supportable and we adopt them as our own. See Schillinger v. Commissioner, supra.
During 1982 and 1983, there were many products comparable to the Energy Brain System being marketed because of the nation's energy conservation needs. Energy management systems were available at the retail level for prices ranging from a few hundred dollars to hundreds of thousands of dollars. The variation in prices of energy management systems was the result of differences in the number of functions controlled by *350 each such system. For example, a more elaborate system would control heating, air conditioning, lighting, and ventilation. Such a system would likely also serve other purposes, such as security, fire protection, and various other monitoring functions. The Energy Brain System controlled only heating, a fact that was indicated in the Information Memorandum. Accordingly, it would properly have been considered a relatively low-end model. Petitioners timely filed their income tax returns for the taxable years 1980, 1981, and 1983. On Form 3468 (Computation of Investment Credit) attached to their 1983 income tax return, petitioners claimed a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that valuation, they claimed an investment credit of $ 10,250. [4]
Petitioners also attached a Schedule C in respect of their Saxon investment to *351 their 1983 return. On the Schedule C, petitioners claimed as deductions a number of expenses, including lease expenses of $ 6,750. Petitioners reported no gross receipts or sales in respect of the Saxon investment on the Schedule C. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their Saxon investment to the taxable years 1980 and 1981 in the amounts of $ 4,800.00 and $ 4,230.42, respectively. As previously indicated, petitioners concede the deficiencies in income taxes for the taxable years in issue. We need therefore only decide whether petitioners are liable for: (1) Additions to tax for negligence; (2) additions to tax for a valuation overstatement; and (3) the increased rate of interest under section 6621(c). OPINION Petitioners bear the burden of proof as to each of the additions to tax and as to the increased rate of interest. Rule 142(a); Bixby v. Commissioner, 58 T.C. 757, 791 (1972). By failing to comply with respondent's discovery request and the Court's Order directing them to provide answers to respondent's interrogatories, petitioners have increased *352 the burden on themselves immeasurably. As a consequence of their intractability during the discovery process, petitioners deprived themselves of the opportunity to introduce more than a limited amount of evidence at trial. We begin with the additions to tax for negligence, the primary issue in this case. Section 6653(a) for 1980 and section 6653(a)(1) for 1981 and 1983 impose an addition to tax in the amount of 5 percent of the underpayment if any portion of the underpayment is due to negligence or intentional disregard of the rules or regulations. For 1981 and 1983, section 6653(a)(2) imposes an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence is defined as the failure to exercise the due care that a reasonable and ordinarily prudent person would employ under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In order to prevail on the issue of negligence, petitioners are obliged to prove that their actions in connection with the Saxon transaction were reasonable in light of their experience and the nature of the investment. See Henry Schwartz Corp. v. Commissioner, 60 T.C 728, 740 (1973). *353 Within this framework, petitioners may prevail if they reasonably relied on competent professional advice. Freytag v. Commissioner, 501 U.S. 868 (1991). As indicated in their brief, "Petitioners dispute the additions to tax since they reasonably relied on the financial, investment and tax advice given to them by individuals who held themselves out to the public as experts in these areas." However, in order for reliance on professional advice to excuse a taxpayer from additions to tax for negligence, the reliance must be reasonable, in good faith, and based upon full disclosure. Freytag v. Commissioner, supra.
When considering the negligence addition, we evaluate the particular facts of each case, judging the relative sophistication of the taxpayer, as well as the manner in which the taxpayer approached the investment. The limited record in this case indicates that petitioners never obtained information regarding the Energy Brain System from anyone other than Graham. Accordingly, the record supports a conclusion that petitioners chose to rely on Graham. The record in this case, however, is wholly inadequate to permit *354 us to conclude that petitioners' reliance was reasonable, was in good faith, and was based on full disclosure. No evidence was introduced that would enable us to determine petitioners' level of sophistication with respect to investment decisions, nor was any evidence introduced that would enable us to determine why petitioners chose to rely solely upon Graham rather than conduct an independent investigation, either on their own or through a disinterested adviser, of the Energy Brain System and its value as an investment. Consequently, we are bound to sustain respondent's determination with respect to the additions to tax for negligence for each of the taxable years in issue. We turn now to the addition to tax for a valuation overstatement. Such an addition to tax may be imposed if an underpayment of tax attributable to a valuation overstatement equals or exceeds $ 1,000. Sec. 6659(a), (d). A valuation overstatement exists if the value of any property or the adjusted basis of any property claimed on a return is 150 percent or more of the amount determined to be the correct amount of such valuation or adjusted basis. Sec. 6659(c)(1). In the event that the reported value exceeds 250 *355 percent of the correct value, an addition to tax of 30 percent of the underpayment of tax attributable to such overstatement is imposed. Sec. 6659(b). Section 6659 does not apply, however, to underpayments of tax that are not attributable to valuation overstatements. Todd v. Commissioner, 862 F.2d 540 (5th Cir. 1988), affg. 89 T.C. 912 (1987)(where taxpayers were not entitled to claimed investment tax credits because property was not placed in service during the years in issue, the underpayment was not attributable to a valuation overstatement). On their 1983 income tax return, petitioners claimed a value of $ 102,500 for their one-half interest in the Energy Brain System. On the basis of that valuation, petitioners claimed an investment tax credit of $ 10,250 and utilized $ 1,219.58 of that amount to reduce their reported income tax liability for 1983 to zero. They also claimed as deductions a number of expenses relating to the Saxon investment, including lease expenses of $ 6,750. On a Form 1045, Application for Tentative Refund, filed with respondent, petitioners claimed investment credit carrybacks pertaining to their *356 Saxon investment to the taxable years 1980 and 1981 in the amounts of $ 4,800.00 and $ 4,230.42, respectively. On the basis of respondent's expert's Study, we have concluded that the fair market value of the Energy Brain System did not exceed $ 795. Therefore, petitioners' valuation of the Energy Brain System constitutes a valuation overstatement. Sec. 6659(c)(1). We must now decide whether the deficiency in income tax for each of the taxable years in issue is attributable to the valuation overstatement. Sec. 6659(a); see, e.g., Gilman v. Commissioner, 933 F.2d 143, 151 (2d Cir. 1991), affg. T.C. Memo. 1990-205; Massengill v. Commissioner, 876 F.2d 616, 619-620 (8th Cir. 1989), affg. T.C. Memo. 1988-427; Todd v. Commissioner, supra; Urbanski v. Commissioner, T.C. Memo. 1994-384. [5]
*357 Part of the deficiency for 1983, as well as the deficiencies for 1980 and 1981, resulted from the disallowance of the investment tax credits claimed by petitioners with respect to their 1983 Saxon investment. Nonetheless, as discussed below, we hold that no part of the deficiency for any of the years in issue is attributable to the valuation overstatement because a valid election to transfer the investment tax credits from lessor to lessee was never executed. Sec. 48(d)(1); Todd v. Commissioner, supra; Kerry v. Commissioner, 89 T.C. 327 (1987); sec. 1.48-4(f), Income Tax Regs.
After paying an advanced guaranteed rental fee of $ 6,750 for their one-half interest in the Energy Brain System for the period December 31, 1983 through December 31, 1984, petitioners executed a document entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". This document, however, was not signed by any Saxon representative. Section 48(d)(1) provides, in relevant part: A person * * * who is a lessor of property may (at such time, in such manner, and subject to such conditions as are provided by regulations prescribed by the Secretary) elect * *358 * * to treat the lessee as having acquired such property * * *
The regulations promulgated under section 48(d)(1) provide, also in relevant part: The election of a lessor with respect to a particular property (or properties) shall be made by filing a statement with the lessee, signed by the lessor and including the written consent of the lessee, containing the following information * * * [Sec. 1.48-4(f), Income Tax Regs.; emphasis added].
Although petitioners attempted to execute an election in accord with section 48(d), no Saxon representative signed the form entitled "Election to Pass Investment Tax Credits from Lessor to Lessee". In Kerry v. Commissioner, supra, the Court held that in the absence of strict compliance with the regulations, a valid election to transfer the investment tax credit from lessor to lessee could not occur. Because the regulations require that the lessor actually sign a statement electing to transfer the investment tax credit to the lessee, no valid election was made in this instance. Accordingly, the disallowance of petitioners' claimed investment tax credit with respect to the 1983 Saxon transaction *359 must be based upon the fact that no valid election occurred. Consequently, the underpayments resulting from the disallowance of the investment tax credits are not attributable to the valuation overstatement which exists for each of the years in issue. Sec. 6659(a); Todd v. Commissioner, supra.
In view of the foregoing, we do not sustain respondent's determination that petitioners are subject the addition to tax under section 6659(a). We note, however, that "Congress is, of course, * * * free to change the result in cases such as this by imposing additions to tax or additional interest on underpayments attributable to transactions 'accompanied by a valuation overstatement'". Todd v. Commissioner, 89 T.C. 912, 921-922 (1987), affd. 862 F.2d 540 (5th Cir. 1988). Finally, section 6621(c) provides for an increased rate of interest with respect to any underpayment in excess of $ 1,000 which is "attributable to 1 or more tax-motivated transactions". Sec. 6621(c)(1) and (2). The increased rate of interest applies to interest accruing after December 31, 1984. See DeMartino v. Commissioner, 88 T.C. 583, 589 (1987), *360 affd. 862 F.2d 400 (2d Cir. 1988)(the increased rate of interest applies to interest accruing after December 31, 1984, even though the transaction in question was entered into before the date of enactment of section 6621(c)). Respondent determined that petitioners were liable for increased interest because the underpayments for the years in issue were attributable to a tax-motivated transaction. Petitioners failed to produce any evidence to counter respondent's determination. Indeed, the factual evidence introduced supports the conclusion that the underpayments for the years in issue are attributable to a tax-motivated transaction. See section 6621(c)(3)(A)(v), (B); section 301.6621-2T, Temporary Proced. & Admin. Regs.; 49 Fed. Reg. 50390 (Dec. 28, 1984). Nevertheless, we are unable to sustain in full respondent's determination. Rather, we hold that petitioners are liable for the increased rate of interest only in respect of that portion of the underpayment for 1983 that is attributable to the disallowed Schedule C deductions. [6] Petitioners are not liable for the increased rate of interest for either 1980 and 1981 or on that *361 portion of the underpayment for 1983 that is attributable to the disallowed investment credit. McCrary v. Commissioner, 92 T.C. 827, 857-860 (1989). To reflect our disposition of the disputed issues, as well as petitioners' concessions, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence in the amount of $ 4,230.42 for 1981.↩
2. 50 percent of the statutory interest due on the amount of the deficiency attributable to negligence in the amount of $ 2,837.70 for 1983.↩
2. The Court's Order dated Nov. 29, 1993, expressly warned petitioners that if they did not fully comply with its provisions, the Court would impose sanctions pursuant to Rule 104, which could include dismissal of the case and entry of decision against them.↩
3. We use the term "investment" solely for the sake of convenience.↩
4. Of this amount, petitioners utilized $ 1,219.58 on their 1983 return in order to reduce their reported income tax liability for that year to zero.↩
5. Sec. 6659 applies to returns filed after Dec. 31, 1981. When an item carried back from a later year (such as 1983) to an earlier year (such as 1980 or 1981) is "attributable to" the adjustments in the later year, sec. 6659 may be applied to returns filed before Jan. 1, 1982. Nielsen v. Commissioner, 87 T.C. 779↩ (1986).
6. We assume that the portion of the underpayment for 1983 that is attributable to the disallowed Schedule C deductions exceeds $ 1,000, but we leave such matter to the parties as part of their Rule 155 computation.↩