Nott, J.,
delivered the opinion of-the court:
This is an action brought to recover $31,583 45 damages growing out of a contract for the manufacture of mail locks, which was made in 1837, by Amos Kendall, Postmaster General.
This case has been tried before, and final judgment therein rendered by the court, whereby it was decided that the claimant’s contract did not bind the defendants, and hence that he could not recover. (1 C. Cl’s’R., p. 71.) The case now comes back to us under a joint resolution of Congress, which is as follows :
“ Resolved by the Senate and House of Representatives of the United' States of America in Congress assembled, That the claim of Joseph Nock for damages occasioned by the annulment of his contract for furnishing locks and keys for the use of the United States mail, and also for the use of said Nock’s patent in the manufacture of mail locks, subsequent to such annulment, be, and it is hereby, referred to the Court of Claims for its decision, in accordance with the principles of equity and justice : Provided, That said court do not render judgment for a greater sum than is contained in the report of Solicitor Comstock to the Senate, dated December 22, A. D. 1852.”
Approved June 25, 1856. (14 Stat. L., p. 32.)
And with regard to this resolution the assistant solicitor takes the preliminary objection that it is unconstitutional and void. The grounds upon which he rests this objection are—
1st. That Congress have no judicial powers which will authorize them to set aside the judgment of a court, and award a party a new trial; and
2d. That Congress have also limited the judgment which may be rendered to a certain amount, and that no such discretion to fetter or circumscribe the course of justice is by the Constitution vested in Congress. It is also pressed upon our attention by the assistant solicitor that there are a number of similar eases to which the same objection may be raised.
The joint resolution was brought before Congress by a report from the committee of the Senate, which, as it aids in construing the resolu *456 tion and contains a concise history of the case, it may be as well to quote in full:
“The Committee on the Post Office and Post roads, to whom was referred the claim of Joseph Nock for damages arising from the annulling his contract for supplying the Post Office Department with mail locks and keys, and also for the use of his patent for the construction of mail locks, report:
“ That it appears that the petitioner, who is a native of Germany, in July, 1839, obtained a patent from the United States for a padlock of his own invention. About the same time the Postmaster General had resolved to procure a better lock than the on& then in use for the mail service of the United States, and after examining several specimens, on the 18th of November, 1839, informed petitioner in writing that he was authorized to make mail locks for the Post Office Department, according to the patterns furnished by him, at the prices named in the letter. On the 7th of March, 1840, Nock, in consideration of this authority, or contract, ‘for the purpose of securing the United States in the exclusive right to use the said locks and keys for the safety of the mails,’ assigned the said patent to the United States, which assignment was to be made void if the Postmaster General should cease to employ him as the exclusive manufacturer of said mail locks and keys for the United States. On the 28th of October, 1840, a new contract was made, requiring an additional spring in the locks, and required Nock to enter into bonds in the penal sum of $10,000 to well and faithfully manufacture the locks as ordered, not exceeding 1,000 locks and 2,000 keys per calendar month. Soon after this the contract was suspended by the Postmaster General, and subsequently annulled.
“Nock also requested the department to reassign his patent to him, which was refused.
“This branch of this case has with little intermission engaged the consideration of Congress sinee 1841.
“ Several reports have been made upon it as follows :
“1. H. R. report No. 290, 27th Congress, 3d session, decided both the law and facts in favor of petitioner, and was accompanied with a resolution referring the case for examination to Solicitor Penrose.
“2. H. R. report No. 493, 28th Congress, 1st session, accompanied with the report of Solicitor Penrose, and a bill in conformity therewith for $7,473 43, which bill was not acted upon.
“3. H. R. report No. 337, 29th Congress, 1st session, adverse to petitioner.
*457 “4. Senate report No. 232, 28th Congress, 1st session, accompanying bill No. 349, appropriating the amount reported by Solicitor Pen-rose.
“5. Senate resolution of 32d Congress, 1st session, January 25, 1852, referring the claim to Solicitor Comstock.
“6. Senate bill No. 411, 32d Congress, 2d session,"accompanying bill No. 625, appropriating to petitioner $21,940 25, with interest from November 1,1845.
“No action was had upon either of these reports.
“ The case was afterwards referred to the Court of Claims, which decided adversely to the petitioner upon the technical legal grounds that as there was no legal obligation on the part of the government under the contract to order more locks than it pleased, and consequently could rescind the contract whenevefit pleased, and that the refusal to reassign the contract involved no legal obligation on the government for damages.
“Yet, in the opinion of this committee, there were equities existing between the government and said Nock, arising out of this contract; that he entered into the contract with and assigned his patent to the government in good faith, upon the reasonable supposition that he was to manufacture mail locks and keys for the mail service, and in removing from Philadelphia to Washington, and in purchasing and fitting up his shop in the latter place, he so involved himself that he was utterly ruined financially. He was imprisoned for his debts created on account of such contract, and confined in a jail secured by his own locks, and he was thereby rendered unable to use his patent to advantage by reasons of the encumbrance occasioned by the assignment to the United States ; and further, that afterwards a contract.was entered into for the supply of mail locks and keys with one Henry C. Jones, who was directed by the Post Office Department to make the locks upon the principle of Nock’s patent, and which principle has been used by the Post Office Department until very recently. It is therefore considered that the petitioner is entitled to relief, hut as this committee have not the means or facilities to fully investigate the case, it recommends that the matter of the memorial of the petitioner he referred to the Court of Claims to decide upon the principles of equity and justice.”
If the objections were allowed to rest upon the grounds whereon the assistant solicitor has placed them, I apprehend that they would be found fatal to the case. It is unquestionable that the Constitution has invested Congress with no judicial powers ; it cannot be doubted that *458 a legislative direction to a court to find a judgment in a certain way would be little less than a judgment rendered directly by Congress. But here Congress do not attempt to award judgment, nor to grant a new trial judicially ; neither have they reversed a decree of this court; nor attempted in any way to interfere with the administration of justice. Congress are here to all intents and purposes the defendants, and as such they come into court through this resolution and say that they will not plead the former trial in bar, nor interpose the legal objection which defeated a recovery before, but that they thus consent upon the condition that the recovery, if any shall be had, shall not exceed a certain amount. The claimant has no rights here except under this consent, and he limits his demands accordingly. If the court should find a larger amount to be due, the excess would be remitted and judgment entered for the amount demanded in the claimant’s petition. Apart from this view of the question, it would be enough to say that the defendants cannot be sued except with their own consent; and Congress have the same power to give this consent to a second action as they had to give it to a first.
It is further objected by the assistant solicitor that “the authority conferred upon the court to settle this claim according to principles of justice and equity does not authorize the court to disregard plain principles of law,” and he cites the ease of De Groot v. The United States, (1 C. Cls. R., 97,) wherein the resolution of Congress uses the same phrase “ on principles of justice and equity.” In that case the referee, Floyd, then Secretary of War, had totally disregarded the facts of the case and the terms of the submission, and under the names of equity and justice had proceeded to award excessive legal damages against the United States for the pretended breach of a contract where none existed. With reference to such circumstances this court said: “We do not admit, as the counsel appear to assume, that this ‘justice and equity ’ is that vague, undefined, and indefinable sense of fairness and right which would be as different in different cases as the varying passions and prejudices of men. But we understand and suppose it to mean those well-known principles which form the common and general standard of right and justice, as administered in our courts of judicature, and which control and regulate the affairs of life, between man and man.”
In the case now before us the report of the committee evidences the fact that Congress have intended to withdraw a harsh and technical defence, and to leave the court free to award damages for the injuries actually sustained by the claimant from what was in practical effect a *459 violation of the contract by the defendants ; or, as tbe resolution states it, “for damages occasioned by the annulment of his contract, and also for the me of his patent.'’
The case comes before us now on substantially the same evidence which was before presented, and from it we deduce these 'facts : On the 18th November, 1839, Nock was appointed by the Postmaster General sole manufacturer of mail locks for the Post Office Department. On the 20th March, 1840; he assigned his patent right to the defendants “in consideration of being employed by the Postmaster General to make- mail locks and keys for the United States,’’ and the assignment was made “ for the purpose of securing the United States in the exclusive right to use the said locks and keys for the safety of the mails.” There was also a condition expressly providing that “if the Postmaster General should cease to employ the said Nock at the prices aforesaid as the exclusive manufacturer of mail locks and keys for the United Stales, then this assignment shall be null and void.” On the faith of these agreements Nock removed from Philadelphia to Washington, and embarked all his means in erecting a factory to make the government locks. On the 28th October, 1840, the defendants also required from him security for the faithful performance of his agreement, which was given in the form of a bond with proper sureties in the penalty of $10,000.' After this bond was given and the factory erected the defendants never gave the claimant a single order nor received from him a single lock, but without cause or excuse annulled the contract. Some hand-made locks, slightly defective, had been previously rejected, but these, it appears, were made before the bond was required from the claimant, which was in effect a third contract. On the 23d August, 1845, the Postmaster General refused to reassign the patent because the claimant had “ appealed to Congress for damages in consequence of the action of the'department,” and it was thought advisable by the.Postmaster General “to let everything remain in the exact position ” in which he found it. The refusal of the defendants to reassign operated as a cloud on the claimant’s title, in consequence of which a company that had been formed to manufacture his locks refused to complete the purchase of his .patent. After the contract had been annulled, the defendants employed the Perth Amboy Company as manufacturers, and subsequently one Henry C. Jones. Up to this time the patent had lain entirely useless in the hands of the defendants, but an agent of the department then instructed Jones to use some of the improvements which it covered, and thereby revived the use of the patent by the defendants.
*460 The construction which we now give to these facts is that the defendants by refusing to reassign to Nock his patent, and by subsequently using it in the manufacture of the Jones lock, prolonged the obligations of the contract; and that by appointing Nock exclusive manufacturer of mail locks they were bound to furnish to him all of that work during the life of the patent. There is indeed a claim for damages for “the use of the patent” recited in the resolution, but as the defendants were entitled by the contract to this use of the patent, it is evident that no damages could have been suffered by reason of their employing another manufacturer to make the locks. The claimant’s damages arise from the fact that the defendants did not employ him, and remuneration for the use of the patent must be found in the profits growing out of the contract.
It is a question of much difficulty what those profits were. The claimant has called as a witness a clerk in the Post Office Department, who attempts to show the number of locks purchased of other manufacturers. But it is apparent that the 97,000 which he assigns to Jones were manufactured in part after the patent had expired, and hence do not affect the claimant’s contract. The witness also expressly states that he has been connected with the department only since October, 1851, and that his knowledge of the matters of which he testifies were “talcen from the records of that department.” In Brown & Oo.’s case (10. 01s. B.., p. 377) it was decided that official documents need not be produced in evidence, but their contents must be shown by authenticated copies, and not by parol. The same rule would apply to the records of a department, and the testimony is clearly inadmissible.
The evidence as to the profits which the claimant might have realized per lock is not clear or satisfactory, and after the lapse of so many years we can hardly expect that it should be. I therefore think that it would be more just to the parties, and more in accordance with the resolution of Congress, to estimate the profits in the following manner :
The bond of the claimant was given to the defendants in October, 1840. The patent had then nearly thirteen years to run. During those thirteen years, as appears by the reports of the Auditors of the Treasury, there were manufactured and sold by other parties to the defendants 73,153 iron and 9,406, brass locks; also 31,122 iron and 880 brass keys.. The contract price of these articles would have brought the claimant $94,279. Of that sum we allow him as profits 33¿- per ceut., $31,426, and from this we deduct $4,000 for his factory, leaving a balance of $27,426. Ordinarily there would be deducted *461 from this tbe value of tie claimant’s services during the period he was not employed; but in view of the liberal intent manifested by Congress, and of the great loss of time suffered by the claimant while prosecuting this case, reaching through a period of twenty-seven years, we make no further deduction. The item in the claimant’s brief for pay for certain locks refused by the Post Office Department is not set up in the petition nor included in the resolution of Congress. The demand for interest is expressly denied by the act, 1863, (12 Stat. L., p. 765,) and is not expressly given by the resolution. The terms ‘‘justice and equity” and the reference to the report of Solicitor Com-stock, by whom interest for eight years was allowed, hardly take the case out of the statute.
The judgment of the court is that the claimant recover $27,426.
Loring, J., dissented.