1 F.3d 1487
 62 USLW 2091, Fed. Sec. L. Rep. P 97,684
 Ed PLAUT; his wife, Nancy McHardy Plaut; John Grady, on
behalf of themselves and all others similarly
situated, Plaintiffs-Appellants,
v.
SPENDTHRIFT FARM, INC.; Bateman Eichler, Hill Richards,
Inc.; Francis M. Wheat; Gibson, Dunn & Crutcher;
Deloitte, Haskins & Sells; Norman D. Owens; American
International Bloodstock Agency, Inc., Defendants-Appellees.
 No. 92-5591.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 1, 1993.
Decided Aug. 3, 1993.
Rehearing and Suggestion for Rehearing En Banc Denied Oct. 14, 1993.
 
 J. Montjoy Trimble (argued and briefed), Trimble & Bowling, Lexington, KY, for plaintiffs-appellants.
 Richard C. Ward, David C. Long, Barbara Edleman (briefed), Glenn C. Van Bever (argued), Wyatt, Tarrant & Combs, Lexington, KY, for Spendthrift Farm, Inc.
 Guy R. Colson, Sr. Partner, Fowler, Measle & Bell, Elizabeth S. Feamster, Lexington, KY, James E. Burns, Jr., John Missing, Kevin P. Muck (briefed), Brobeck, Phleger & Harrison, San Francisco, CA, for Bateman Eichler, Hill Richards Inc.
 Robert M. Watt, III (briefed), J. David Smith, Jr., Stoll, Keenon & Park, Lexington, KY, William E. Johnson, Stoll, Keenon & Park, Frankfort, KY, for Francis M. Wheat, and Gibson, Dunn & Crutcher.
 L. Clifford Craig (argued and briefed), Taft, Stettinius & Hollister, Cincinnati, OH, Peter L. Ecabert, Deloitte, Haskins & Sells, New York City, Robert B. Craig (briefed), Taft, Stettinius & Hollister, Crestview Hills, KY, for Deloitte, Haskins & Sells.
 Michael D. Meuser, Frank T. Becker, Harry B. Miller, Jr., Robert S. Miller (argued and briefed), Miller, Griffin & Marks, Lexington, KY, for Norman D. Owens and American Intern. Bloodstock Agency, Inc.
 Scott R. McIntosh (briefed), U.S. Dept. of Justice, Appellate Div., Washington, DC, Barbara C. Biddle, U.S. Dept. of Justice, Appellate Staff, Civ. Div., Mark B. Stern (argued), U.S. Dept. of Justice, Civ. Div., Washington, DC, for amicus curiae U.S. and Securities and Exchange Com'n.
 Kathryn Oberly (briefed), Washington, DC, for amicus curiae Arthur Andersen & Co., Ernst & Young, KPMG Peat Marwick and Price Waterhouse.
 Before: KEITH and BATCHELDER, Circuit Judges; and CHURCHILL, Senior District Judge.*
 BATCHELDER, Circuit Judge.
 
 I.
 
 1
 Appellants, the plaintiffs before the District Court, representing a large number of sometime investors, originally sued defendants on November 25, 1987, alleging violations of the securities laws, namely fraud and deceit in the sale of stock under Section 10(b) of the Securities Exchange Act of 1934 ("1934 Act")[1] and Securities and Exchange Commission Rule 10b-5.[2] Defendants owned "one of the Commonwealth's premier thoroughbred horse farms" (the District Court's characterization, to which we owe every deference) and issued stock in the enterprise in order to raise some thirty million dollars in cash; others of the named defendants were various legal and financial advisers to the venture. The appellants (or "shareholders") originally purchased their stock when defendants offered it for public sale in 1983.
 
 
 2
 For over three years, the pretrial litigation in the District Court proceeded apace. On June 20, 1991, however, the Supreme Court handed down Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, --- U.S. ----, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), which applied a uniform Federal time limit from another section of the 1934 Act to that action and all private Sec. 10(b) actions. Lampf provided a three year period of repose, running from the date of a fraudulent securities contract of sale, or a one year limitation period, running from the date of discovery of the fraud.[3]
 
 
 3
 The District Court, applying Lampf retroactively on the authority of Beam Distilling Corp. v. Georgia, --- U.S. ----, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), which was announced the same day as Lampf, dismissed the shareholders' claims with prejudice on August 13, 1991. The shareholders did not file what they believed (correctly) would have been a meritless and indeed sanctionable appeal.
 
 
 4
 In November 1991, Congress passed the FDIC Improvement Act of 1991, ("1991 Act") which, on a plaintiff's motion made within sixty days of the effective date of the statute, December 19, 1991, required the District Courts to reinstate claims which had been dismissed as a result of the application of the Federal statute of limitations announced in Lampf. The shareholders filed such a motion on February 11, 1992. While finding that under the statute the shareholders were entitled to have their claims reinstated, the District Court held the statute unconstitutional as applied and denied the motion 789 F.Supp. 231. Since the portion of the 1991 Act which commands the District Court to reinstate the shareholders' dismissed cause of action violates the doctrine of separation of powers and deprives the defendants of their vested rights in the court's final judgment, we affirm.
 
 II.
 
 5
 The disputed statutory provision of the 1991 Act provides:
 
 
 6
 (b) Effect on dismissed causes of action
 
 
 7
 Any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991
 
 
 8
 (1) which was dismissed as time barred subsequent to June 19, 1991,[4] and
 
 
 9
 (2) which would have been timely filed under the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such law existed on June 19, 1991,
 
 
 10
 shall be reinstated on motion by the plaintiff not later than 60 days after Dec. 19, 1991.
 
 
 11
 15 U.S.C. Sec. 78aa-1.[5] The statute's language is plain and unambiguous. It applies only to the claims of the parties in Lampf and to those lawsuits which were dismissed as a result of Lampf's retroactive application. The statute commands the Federal courts to reinstate cases which those courts have dismissed. Where the word "shall" appears in a statutory directive, "Congress could not have chosen stronger words to express its intent that [the specified action] be mandatory...." United States v. Monsanto, 491 U.S. 600, 607, 109 S.Ct. 2657, 2662, 105 L.Ed.2d 512 (1989).
 
 
 12
 Refreshingly, none of the litigants at our bar has suggested that Sec. 27A means anything other than what it plainly says. This is certainly not a case in which the issue of separation of powers
 
 
 13
 comes before the [c]ourt clad, so to speak, in sheep's clothing: [where] the potential of the asserted principle to effect important change in the equilibrium of power is not immediately evident, and must be discerned by a careful and perceptive analysis.
 
 
 14
 Morrison v. Olson, 487 U.S. 654, 699, 108 S.Ct. 2597, 2623, 101 L.Ed.2d 569 (1988) (Scalia, J., dissenting). If Justice Scalia, the lone dissenter in Morrison, thought that the challenged independent counsel law was a wolf which came "as a wolf," id., we think that Sec. 27A comes as a camel, one that has forcibly and quite unapologetically thrust its nose into the tent of the judicial branch.
 
 
 15
 A. A brief historical background.
 
 
 16
 To answer the question upon which the constitutionality of Sec. 27A hinges, we must reach far back into American legal history. During the first century or so of colonial government, legislative edicts requiring courts to reopen, vacate, rehear, or even reverse settled decisions upon the petition of the aggrieved losing party were not uncommon.[6] Noting the apparent prevalence of legislative adjudication of private disputes and grievances in the early colonial period, historians have concluded that such action did not offend the legal or political sensibilities of the time.[7] However, these sensibilities changed considerably during the years following the outbreak of the Revolutionary War, particularly with the escalation of legislative interference in private disputes which occurred during the time of the Articles of Confederation, notably and most frequently to grant debtors "relief" from creditors.[8] "Once legislative interference in judicial matters had intensified as never before in the eighteenth century, a new appreciation of the role of the judiciary in American politics [began] to emerge." Id. at 454.
 
 
 17
 The transformation of the legislature from its occasional role as an informal court of last resort, dishing out equitable relief to particularly aggrieved citizens, to a "department [which] is everywhere extending the sphere of its activity and drawing all power into its impetuous vortex," as James Madison described the legislative element of government in The Federalist 48, deeply concerned the fledgling Nation's leaders, most notably those who met in Philadelphia in 1787 to revise the Articles of Confederation. Their concern translated into many of the Constitution's specific enumerations of and limitations on power, as well as the "political truth" embodied in the document that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands ... may justly be pronounced the very definition of tyranny" and that "the preservation of liberty requires that the three great departments of power should be separate and distinct." The Federalist 47 (James Madison).
 
 
 18
 Defending the Constitution against charges that its provisions did not ensure adequate separation among the branches, Madison explained that good government did not require its departments to be "totally separate and distinct from one another." The nature of the power exerted, not the person or body exerting it, mattered: "[W]here the whole power of one department is exercised by the same hands which possess the whole power of another department, the fundamental principles of a free constitution are subverted." Federalist 47. In the specific context of the separation between legislature and judiciary, he noted, "[t]he entire legislature can perform no judiciary act"; pursuing the point, he quoted Montesquieu: "Were the power of judging joined with the legislative, the life and liberty of the subject would be exposed to arbitrary control, for the judge would then be the legislator." Id.
 
 
 19
 In illustrating the dangers of the "encroaching spirit of power," Madison emphasized the dynamic counterbalancing the Constitution envisioned among the branches of government, which he immortalized concisely in declaring that "[a]mbition must be made to counteract ambition." Federalist 48, 50. He cited first the example of Virginia, where that Commonwealth's constitution prescribed the separation of powers, but where Jefferson had complained that "no barrier was provided between these several powers." Federalist 48 (quoting Thomas Jefferson, Notes on the State of Virginia (1784)). Madison noted that Jefferson had observed, with concern, that the Virginia legislature had "in many instances, decided rights which should have been left to judiciary controversy...." Id. Madison pointed out the same dangerous trend in Pennsylvania, where "the [State] Constitution had been flagrantly violated by the legislature in a variety of important instances," including where "cases belonging to the judiciary department [had been] frequently drawn within legislative cognizance and determination." Id. "The conclusion," Madison summarized,which I am warranted in drawing from these observations is that a mere demarcation on parchment of the constitutional limits of the several departments is not a sufficient guard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands.
 
 
 20
 Id.
 
 
 21
 B. The Separation of Powers Applied and Enforced.
 
 
 22
 After the States ratified the Constitution, it did not take long for fears of legislative encroachment on the judiciary's sphere of action to be realized. In 1791, Congress enacted a scheme by which disabled Revolutionary War veterans could apply for pensions. Veterans were to make application to the Federal Circuit Courts, which would then accept (or reject) their assertions that they were actually veterans, and render judgment as to the amount of pension appropriate to their disabilities. However, Congress gave the Secretary of War the final say; he could deny pensions where he suspected "imposition or mistake." Hayburn's Case, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792), as described in 13 Charles A. Wright et al., Federal Practice and Procedure Sec. 3529.1 at 302 (1984).
 
 
 23
 At that time, the Justices of the Supreme Court "rode circuit" and comprised the Federal Circuit Courts, sitting with District Court judges. The (then) five Justices of the Supreme Court were confronted with the pension act while sitting with three District Court judges on separate Circuit Court panels convened in New York, Pennsylvania, and North Carolina. Each panel independently and unanimously declined to hear the veterans' petitions, reasoning that for the courts to render judgments subject to review by the Congress was violative of the separation of powers.[9] This result was in essence the Court's first invalidation of an act of Congress. No doubt recognizing the gravity of this situation, both the Pennsylvania and North Carolina panels sent letters, jointly authored by the sitting judges, to President Washington informing him directly of their respective decisions and explaining the reasoning behind their objections.[10]
 
 The Justices sitting in New York noted
 
 24
 [t]hat by the Constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either.... [The Act] subjects the decisions of these courts, made pursuant to those [judicial] duties, first to the consideration and suspension of the secretary of war, and then to the revision of the Legislature; whereas, by the constitution, neither the secretary of war, nor any other executive officer, nor even the Legislature, are authorized to sit as a court of errors on the judicial acts or opinions of this court.
 
 
 25
 Hayburn's Case, 2 U.S. at 409-10 n. 2.
 
 
 26
 Similarly, the Justices sitting in Pennsylvania went straight to the heart of the matter. They noted that "the people of the United States have vested in Congress all legislative powers granted in the constitution" and have vested in the courts "the judicial power of the United States." Hayburn's Case, 2 U.S. at 410 n. 2.
 
 
 27
 It is a principle important to freedom, that in government, the judicial should be distinct from, and independent of, the legislative department.... [The people] have placed their judicial power not in Congress, but in "courts."
 
 
 28
 Id. Holding that the Act required judges to carry out "business ... not of a judicial nature," the Justices went on to explain how the Act, if executed as Congress prescribed, offended the separation of powers:
 
 
 29
 [I]f ... the court had proceeded, its judgments (for its opinions are its judgments) might, under the same act, have been revised and controled by the legislature, and by an officer in the executive department. Such revision and control we deemed radically inconsistent with the independence of that judicial power which is vested in the courts; and, consequently, with that important principle which is so strictly observed by the constitution of the United States.
 
 
 30
 Id. The North Carolina court echoed this interpretation:
 
 
 31
 [N]o decision of any court of the United States can, under any circumstances, in our opinion, agreeable to the constitution, be liable to a reversion, or even suspension, by the legislature itself, in whom no judicial power of any kind appears to be vested....
 
 
 32
 Id. With this unprecedented, "painful" ruling, the Justices, some of whom had been at the Philadelphia Convention, made it clear that the Federal judiciary power, while defined in its reach by the Congress, could not be exercised by that body. The Court anchored its holding in the Constitution's succinct sentences vesting the legislative and judicial powers in their respective branches, and, necessarily, in the historical and theoretical understanding of the nature of the judicial power which had been incorporated into the Constitution.
 
 III.
 
 33
 We have devoted several pages to Hayburn's Case and the background of the constitutional separation between the legislature and the judiciary, not to kill trees, but to illustrate that the Supreme Court has from the beginning maintained the rule that Congress may not retroactively disturb final judgments of the Federal courts, and to explain the Court's adherence to that rule as a protection of the separation of powers. We search in vain for an instance where the courts have permitted Congress retroactively to disturb final judgments rendered in cases between private litigants.[11] If the statute which gave rise to Hayburn's Case violated the Constitution, then Sec. 27A(b) cannot stand, a fortiori. Reserving to Congress the power to "suspen[d]" and "revis[e]" decisions of the Supreme Court which had interpreted and applied valid Federal law would enable the Congress to sit as a "court of errors." In enacting Sec. 27A, Congress has not simply reserved such power, as in Hayburn's Case, but actually exercised it. Since we cannot say that the fundamental natures of the legislative and judicial powers have somehow changed since 1792, we cannot square Sec. 27A(b) with Hayburn's Case. The dangers to judicial independence in a system of separate powers remain; we are no more willing to ratify a legislative usurpation of the judicial power today than the Court was in 1792.[12]
 
 
 34
 The shareholders cite several cases they believe illustrate exceptions to this longstanding rule. They argue, in essence, that because Congress has the power in certain circumstances to affect the application or effect of judicial actions, this power necessarily extends to all judgments, including the final judgments of the Federal courts.[13] Intervening on behalf of the shareholders, the United States argues that in fact no such rule has survived at all. However, we believe the rule to be not only alive but vital to the continuing integrity of the independent Federal judiciary; further, we believe no true exceptions to the rule exist. Not only is each case cited by shareholders and the Government distinguishable, but the Supreme Court has taken great pains to reinforce the final judgment rule in every instance where it has been invoked.
 
 
 35
 The Government completely mischaracterizes the cases it cites in support of its argument that "the Supreme Court has explicitly upheld a wide range of federal and state statutes that have divested litigants of final judgments." For example, the Government cites Pennsylvania v. Wheeling and Belmont Bridge Co. (the Wheeling Bridge Case ), 59 U.S. (18 How.) 421, 15 L.Ed. 435 (1856), which involved a bridge that defendants had built at the behest of the Commonwealth of Virginia spanning the Ohio River. In an earlier action, Pennsylvania had succeeded in getting the Supreme Court to declare the bridge an "obstruction of the free navigation of the ... river" which harmed commerce in Pennsylvania; the Court granted injunctive relief requiring that the bridge be torn down or rebuilt with sufficient height to permit riverboat traffic. Id. at 429. The Court also awarded costs to the plaintiff. Id. In response, an act of Congress was passed declaring the bridge to be a "lawful structure," declaring the bridge and the roads it connected to be a Federal post road, and requiring riverboat operators not to interfere with the construction or operation of the bridge. Id. Pennsylvania nonetheless moved the Court to enjoin the rebuilding of the bridge (which a storm had since destroyed), arguing both that the new act of Congress was inconsistent with the free navigation of the river which Congress had guaranteed by previous enactment, id. at 430, and that the new act of Congress could not have the effect and operation of annulling the prior judgment of the Court, id. at 431.
 
 
 36
 Congress has the power "to regulate the navigation of the river," the Court noted; it similarly has the power "to regulate commerce among the several States." Wheeling Bridge, 59 U.S. at 430, 431. Since Congress ultimately controls both these powers, its retroactive legalization of the bridge "modifies" its previous enactments ensuring free navigation; "although it still may be an obstruction in fact, [it] is not so in contemplation of law." Id. at 430. Thus, Pennsylvania's injunctive relief, which entitled it to demand that the builders alter or destroy the bridge as necessary to preserve Congress's mandate that there be unhindered navigation of the Ohio River, had no force once Congress had redefined the river's navigability to include the presence of the bridge.
 
 
 37
 Since injunctive relief necessarily depends on a continuing affront to one's legal rights, while legal relief depends only on a judicial determination that one's legal rights have been violated with resulting cognizable damage to the claimant, Congress could permissibly change the law so as to deprive a party of its right to injunctive relief. However, the Wheeling Bridge Case does not, as the Government would have us believe, therefore hold that Congress may act to deprive all parties of final judgments rendered in their favor. The Wheeling Bridge Court not only recognized but stressed this distinction, and took the opportunity to restate, in the strongest terms, the general rule against legislative modification of settled judgments:
 
 
 38
 But it is urged that the Act of Congress cannot have the effect and operation to annul the judgment of the court already rendered, or the rights determined thereby in favor of the plaintiff. This, as a general proposition, is certainly not to be denied, especially, as it respects adjudication upon the private rights of parties. When they have passed into judgment, the right becomes absolute, and it is the duty of the court to enforce it....
 
 
 39
 ....
 
 
 40
 ... [I]f the remedy in this case had been an action at law, and a judgment rendered in favor of the plaintiff for damages, the right to these would have passed beyond the reach of the power of Congress. It would have depended, not upon the public right of the free navigation of the river, but upon the judgment of the court.
 
 
 41
 Wheeling Bridge, 59 U.S. at 431.
 
 
 42
 In other words, had Pennsylvania claimed that it had lost, say, a million dollars in tax revenues as a result of the obstruction, and had the Court affirmed a judgment against the bridge company in that amount prior to the Congress's taking any further action, Congress could not permissibly enact a bill which vacated, reversed, or otherwise disturbed that money judgment. Indeed, the Court noted that the costs it had granted Pennsylvania "st[ood] upon the same principles" and were not affected by the subsequent legislation. Id. The "judgment of the court" results from the court's exercise of judicial power to apply the law in existence at the time of judgment to the facts presented, and to reassign property rights as necessary to satisfy the law. Disputed property rights, such as claims for damages, thus become settled, and are entitled to the judiciary's protection and enforcement.
 
 
 43
 The continuing vitality of the rule against disturbing final judgments notwithstanding, shareholders and the Government nonetheless attempt in the alternative to distinguish the present case, arguing that a judgment rendered in favor of defendants on the basis of a time bar does not have the same finality as a judgment rendered "on the merits." We do not question the traditional legislative power to amend, repeal, or even extend statutory time limits. Where Congress changes or supersedes such time limits, no litigant can properly assert a continuing or vested "right" to the old time limit. See United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801); Campbell v. Holt, 115 U.S. 620, 6 S.Ct. 209, 29 L.Ed. 483 (1885); Chase Securities Corp. v. Donaldson, 325 U.S. 304, 65 S.Ct. 1137, 89 L.Ed. 1628 (1945). However, we reject the Government's argument, based on Congress's power to amend statutes of limitation, that "[a] judgment resting on a statute of limitations is no more 'fundamental,' and no more immune from legislative revision, than the statute of limitations itself." Perhaps vaguely aware of the enormous consequences which would result to our system of government were the Congress's undisputed power to change the existing laws extended to allow it retroactively to change the prior application of those laws by the courts, the Government attempts to limit its argument to "technical, non-substantive" laws such as statutes of limitation and repose.
 
 
 44
 To repeat, we fail to identify a single case (besides the ones holding Sec. 27A to be constitutional) which has held that the decision of a Federal court adjudging a claim to be time-barred is not a final judgment. Again, the cases cited by appellant and the Government hold only that statutes of limitation are "arbitrary enactments by the law-making power," "good only by legislative grace" and may be changed by Congress and applied retroactively to pending cases. Campbell, 115 U.S. at 628, 6 S.Ct. at 213; Chase Securities, 325 U.S. at 314, 65 S.Ct. at 1142. In Chase Securities, for example, the Court noted that the Minnesota courts (whence the appeal arose) had not finally determined whether the plaintiff's case was time-barred, thus the case was
 
 
 45
 not one where a defendant's statutory immunity from suit had been fully adjudged so that legislative action deprived it of a final judgment in its favor.
 
 
 46
 Chase Securities, 325 U.S. at 310, 65 S.Ct. at 1140. While the Chase Securities decision's description of the legislature's power to change statutes of limitations retroactively is indeed sweeping, this language conclusively shows both that the Court believed dismissals of time-barred claims to be "final judgments" and that the Court did not view this legislative power as extending to require that courts substitute a new limitation period in cases finally decided under a previously applicable one. See also Campbell, 115 U.S. at 628, 6 S.Ct. at 213 ("[S]tatutes, shortening the [limitation] period or making it longer, which is necessary to its operation, have always been held to be within the legislative power until the bar is complete." ) (emphasis added).
 
 
 47
 Thus, there is no principled basis on which to defend either the Government's proposed rule or, for that matter, its proposed limitation. Congress may change an established time bar, even with the effect of reviving claims that would otherwise remain "dead" due to the lapse of time. But where the courts have adjudged a claim to be time-barred, Congress cannot compel the courts to reopen a settled judgment and apply the subsequent change in place of the time bar that originally resolved the case, even by giving the new provision retroactive effect. Where a Federal court enters judgment in a case on the basis of a time bar, it confers upon the prevailing party a right based on the protections that the time bar provides. Applying the general principles of existing law to specific circumstances, and enforcing the rights between parties created thereby constitute the essence of the judicial power.
 
 IV.
 
 48
 In only one context has the Supreme Court ratified acts of Congress which specifically required the courts to reconsider issues which had been previously adjudicated and upon which the courts had rendered a final judgment. The shareholders and the Government argue that these cases instruct our present situation; we read them as applying very narrowly, and as standing on a distinct and specifically enumerated constitutional power of Congress. Where the United States has been party to a lawsuit, and the court has rendered judgment in favor of the United States, the Supreme Court has recognized Congress's power to authorize relitigation of the same issues, and have the courts apply such new law as Congress passes retroactively to the same case. While such legislation erases the effects of judgments of the Federal courts, it does not trespass upon the power of the judiciary; the Court has viewed such an act as tantamount to a waiver of liability by the Government, and has ratified such an act as a permissible exercise of Congress's explicit Article I power to pay the debts of the United States.
 
 
 49
 The shareholders and the Government cite the recent Supreme Court decision in Robertson v. Seattle Audubon Society, --- U.S. ----, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992), and its decision in United States v. Sioux Nation of Indians, 448 U.S. 371, 100 S.Ct. 2716, 65 L.Ed 2d 844 (1980), to show that the Constitution does not prohibit Congress from reopening final judgments of the Federal courts. In Seattle Audubon, the Court approved an act of Congress which had amended laws specifying what areas of the Northwest national forests, eco-realm of the elusive northern spotted owl, could be logged. As part of this provision, Congress "determin[ed] and direct[ed]" that the new specifications apply to two cases which the statute noted by name. Seattle Audubon, --- U.S. at ---- - ----, nn. 1-3, 112 S.Ct. at 1411-12, nn. 1-3. In Sioux Nation, Congress acted to permit the plaintiff Indians, who had been pressing their claims in court for nearly a century, and who had lost appeals before the Supreme Court twice before, to relitigate before the Court of Claims; the statute directed the Court of Claims to review the case anew without regard to the prior judgments that the claims court and the Supreme Court had previously rendered in favor of the Government. Sioux Nation, 448 U.S. at 389, 100 S.Ct. at 2727. The Supreme Court upheld that statute as well.
 
 
 50
 Neither case stands in opposition to the Court's longstanding rule against Congressional interference with the settled judgments of the Federal courts. In neither instance did Congress compel the Federal courts to vacate, revise, or reconsider final judgments rendered in cases between private parties. The cases Congress named specifically in the statute considered in Seattle Audubon were pending cases, not decided cases. Indeed, the petitioners challenged the statute on the grounds that Congress had infringed on the judiciary power by prescribing the rule of decision in those cases in contravention of the Klein doctrine,[14] not that Congress had interfered with settled judgments. Seattle Audubon, --- U.S. ---- - ----, 112 S.Ct. at 1414-15.
 
 
 51
 Sioux Nation answered directly the objection that Congress could not "disturb[ ] the finality of a judicial decree" under the longstanding rule set out in Hayburn's Case. Sioux Nation, 448 U.S. at 391-92, 100 S.Ct. at 2728-29. The Court disposed of the objection by framing the issue in terms of Congress's recognized power "to waive the res judicata effect of a prior judgment entered in the Government's favor on a claim against the United States." Id. at 396-97, 100 S.Ct. at 2731-32 (citing United States v. Cherokee Nation, 202 U.S. 101, 26 S.Ct. 588, 50 L.Ed. 949 (1906)). In approving this action, the Court in no way cast doubt on the continuing vitality of the rule in Hayburn's Case. The Court noted that it had in previous cases "affirm[ed] the broad constitutional power of Congress to define and 'to pay the Debts ... of the United States.' " Id. at 397, 100 S.Ct. at 2732 (quoting U.S. Const., Art. I, Sec. 8, cl. 1). Where Congress acts to allow litigants to reassert failed claims against the Government, it does not
 
 
 52
 interfere with the administration of justice. Congress are here to all intents and purposes the defendants, and as such they come into court through this resolution and say that they will not plead the former trial in bar, nor interpose the legal objection which defeated a recovery before.
 
 
 53
 Nock v. United States, 2 Ct.Cl. 451, 457-58, 1800 WL 490 (1867) (approving a joint resolution of Congress authorizing the Court of Claims to reconsider a claim against the United States previously decided in favor of the Government, and to decide the claim "in accordance with the principles of equity and justice") (quoted in Sioux Nation, 448 U.S. at 398, 100 S.Ct. at 2732). Since waiving the defense of res judicata does not "reverse[ ] a decree of [a] court," Sioux Nation, 448 U.S. at 398, 100 S.Ct. at 2732 (quoting Nock, 2 Ct.Cl. at 457-58), statutes in which Congress imposes upon itself "a legal, in recognition of a moral, obligation to pay" claims against it do not "encroach upon the judicial function which ... had previously [been] exercised in adjudicating that the obligation was not legal" and are therefore permissible. Id. at 401, 100 S.Ct. at 2734 (quoting Pope v. United States, 323 U.S. 1, 9-10, 65 S.Ct. 16, 21, 89 L.Ed. 3 (1944)). We do not see this recognition of a constitutionally enumerated power of Congress as creating an exception to the longstanding rule against disturbing judgments rendered in favor of private parties, much less as a rejection of that rule, as the Government suggests. Indeed, the Sioux Nation case allows Congress the power only to ratchet the Government's liability to claimants in favor of private parties; Congress may not disturb final judgments rendered against the United States, since to allow this power would be to permit Congress to act as a judge in its own case to decide a dispute in its favor. Id. at 404-05, 100 S.Ct. at 2735-36 (citing Klein ).
 
 
 54
 Needless to say, the very existence of this appeal suggests that defendants have not chosen to waive their defenses of res judicata with which the District Court vested them in dismissing the shareholders' case with prejudice as time barred. Appellants here simply fail to draw a defensible constitutional parallel between judgments rendered in favor of the United States and judgments rendered in favor of private parties.
 
 V.
 
 55
 We strongly object to the idea put forth by the Government that the judgment rendered in favor of the defendants by the District Court was not truly "final" because of the speed with which Congress acted to undo that judgment. Some final judgments are less final than others only to the extent that some pregnant women are less pregnant than others. The vesting of rights in parties to judgments does not depend upon the consent of Congress, tacit or explicit. And a subsequent act of Congress purporting to divest those rights violates the Constitution regardless of the haste with which the vote is taken and the act signed into law.
 
 
 56
 The shareholders and the Government argue that Congress could properly remedy the "windfall" that Lampf bestowed upon the defendants here and in similar actions. True, the litigants had proceeded under the assumption that the Kentucky Blue Sky law would apply, but the Supreme Court read the Federal securities laws differently.[15] Once the Court had determined the rights of the parties in Lampf, those parties' rights were fixed; similarly, once the District Court applied Lampf to dismiss with prejudice the present litigation, and that decision was not appealed, the rights of these parties were fixed, and the shareholders' claims forever precluded. Without a doubt, certain members, and presumably a majority, of Congress believed these results to be unfair, and, as the Government argues, a "windfall" for the respective defendants.[16] However, Congress may not retrospectively vacate decided cases, regardless of how compelling the perceived injustice visited upon the parties by a valid exercise of the judicial power.
 
 VI.
 
 57
 Our system of Federal government vests in the Congress the legislative power, and in the Article III courts the judicial power. The Constitution makes this allocation of powers explicit, and there is nothing equivocal in its language. It is true that some recent decisions of the Supreme Court have evidenced a willingness to find that the separation of powers so "essential to the preservation of liberty," Mistretta v. United States, 488 U.S. 361, 380, 109 S.Ct. 647, 659, 102 L.Ed.2d 714 (1989), is not offended so long as the actions of one branch do not involve an attempt to increase the powers of that branch at the expense of the powers of another branch, or usurp or impermissibly undermine the powers properly belonging to another branch. See generally Mistretta, 488 U.S. 361, 109 S.Ct. 647; Morrison v. Olson, 487 U.S. 654, 108 S.Ct. 2597 (1988).
 
 
 58
 However, we believe that even if this trend by the Supreme Court may be said to vindicate the "a little separation is enough" view of this essential doctrine, the case at bar clearly represents the irreducible minimum of the separation required to preserve the system's last vestiges of federalism. For if Congress may by legislation reverse or vacate the final judgments of the Federal courts, then Congress has rendered the whole function of the judiciary futile: whether "the whole power of one department is exercised by the same hands which possess the whole power of another department," Mistretta, 488 U.S. at 381, 109 S.Ct. at 659 (quoting The Federalist No. 47 (Madison)) is left subject only to the self-restraint of the legislature. As Jefferson wrote,
 
 
 59
 Nor should our assembly be deluded by the integrity of their own purposes, and conclude that these unlimited powers will never be abused, because themselves are not disposed to abuse them.... The time to guard against corruption and tyranny, is before they shall have gotten hold on us. It is better to keep the wolf out of the fold, than to trust to drawing his teeth and talons after he shall have entered.
 
 
 60
 Thomas Jefferson, Notes on the State of Virginia, Query 13, 121 (1784) (reprinted in Ralph Lerner and Philip B. Kurland, eds., 1 The Founders' Constitution 320 (1987)). Were the validity of the judgments of the judicial branch to depend on the approval of the legislative branch, how much more fully could the legislature increase its own powers at the expense of the judiciary, or usurp or undermine the powers properly belonging to the judicial branch? What part of the camel would then remain outside the tent?
 
 
 61
 Where Congress disagrees with the manner in which the judiciary has interpreted a statute, it may amend that statute so as to effect the proper congressional intent, and thus render the faulty judicial interpretation moot. But Congress may not require the Federal courts to nullify or vacate their properly rendered judgments, regardless of what injustice Congress believes those judgments have visited upon private parties. As the judges writing to George Washington in Hayburn's Case sagely reflected,
 
 
 62
 [I]t is as much our inclination, as it is our duty, to receive with all possible respect every act of the Legislature, and that we never can find ourselves in a more painful situation than to be obliged to object to the execution of any, more especially to the execution of one founded on the purest principles, of humanity and justice, which the act in question undoubtedly is. But, however lamentable a difference in opinion really may be, or with whatever difficulty we may have formed an opinion, we are under the indispensable necessity of acting according to the best dictates of our own judgment, after duly weighing every consideration that can occur to us; which we have done on the present occasion.
 
 
 63
 2 U.S. at 409-10 n. 2 (1792). Since Sec. 27A(b) unambiguously requires courts to do so, we hold that subsection to be an unconstitutional usurpation of the judiciary power. We accordingly AFFIRM the judgment of the District Court denying the shareholders' motion to reinstate their lawsuit.
 
 
 64
 KEITH, Circuit Judge, concurring in part and dissenting in part.
 
 
 65
 The crux of the majority'sargument is that section 27A(b) violates the constitutional principle of separation of powers by asking courts to reverse final judgments. The majority essentially argues that section 27A(b) allows an impermissible reopening of adjudicated cases. Although I agree that section 27A(b) cannot be constitutionally applied to the plaintiffs in the instant case, I write separately because I do not believe that section 27A(b) violates separation of powers principles in all contexts. To the contrary, section 27A(b) is an example of Congress permissibly overriding a judicial interpretation of a statute, without violating principles of separation of powers.
 
 
 66
 The issue of finality is only relevant in this case because the plaintiffs did not appeal the district court's initial dismissal of their claim. If the plaintiffs had appealed that ruling, the judgment could not be considered "final" under any analysis, but instead "pending" until it had completed its way through the appellate process. In Gray v. First Winthrop Corp., 989 F.2d 1564 (9th Cir.1993), the Ninth Circuit held that section 27A(b) did not violate principles of finality for cases which had been appealed. The court stated that:
 
 
 67
 These cases are properly construed as "pending" cases for separation of powers purposes. See Griffith v. Kentucky, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712 n. 6, 93 L.Ed.2d 649 (1987) (judgment is "final" and case is no longer pending only after "the availability of appeal [is] exhausted, and the time for a petition for certiorari [has] elapsed or a petition for certiorari finally [has been] denied"); see also Georgia Ass'n of Retarded Citizens v. McDaniel, 855 F.2d 805, 813 (11th Cir.1988) ("When it so intends, [Congress'] ability to affect the content of a nonfinal judgment in a civil case, through retroactive legislation ceases only when a case's journey through the courts comes to an end."), cert. denied, 490 U.S. 1090, 109 S.Ct. 2431, 104 L.Ed.2d 988 (1989); de Rodulfa v. United States, 461 F.2d 1240, 1253 (D.C.Cir.) ("[T]he suit is pending until the appeal is disposed of, and until disposition any judgment appealed from it is still sub judice.") (internal quotations omitted)), cert. denied, 409 U.S. 949, 93 S.Ct. 270, 34 L.Ed.2d 220 (1972).
 
 
 68
 Id. at 1571.
 
 
 69
 The Seventh Circuit reached the same conclusion in Berning v. A.G. Edward & Sons, Inc., 990 F.2d 272 (7th Cir.1993). The court reasoned that, because the case was pending on appeal at the time that section 27A was passed, there was no final judgment to be upset. The court stated that:
 
 
 70
 The principle that Congress may impose new legal rules applicable in pending cases was recognized by the Supreme Court almost two hundred years ago in United States v. Schooner Peggy, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). Because Congress is free to make changes in the law applicable to pending civil cases, "[t]he legislature may change a statute of limitations at the last instant, extending or abrogating the remedy for an established wrong." Tonya K. ex rel. Diane K. v. Board of Education, 847 F.2d 1243, 1247 (7th Cir.1988).
 
 
 71
 Id. at 277.
 
 
 72
 In the case at hand, Congress was unable to protect these litigants under section 27A(b), because by the time 27A(b) was enacted, the time period for filing an appeal had passed. Nevertheless, for those litigants who did appeal the district court's initial dismissal of their claim, section 27A(b) does not disturb final judgments, and is therefore consistent with separation of powers requirements.
 
 
 73
 Courts are under a duty to impose a saving interpretation of an otherwise unconstitutional statute so long as it is "fairly possible to interpret the statute in a manner that renders it constitutionally valid." Robertson v. Seattle Audubon Society, --- U.S. ----, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992); Communications Workers of Am. v. Beck, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988). Accordingly, I would AFFIRM the judgment of the district court on the grounds that section 27A(b) cannot be constitutionally applied to the litigants in the instant case, but I would not find section 27A(b) unconstitutional as applied to litigants who appealed the initial dismissal of their claims.
 
 
 
 *
 The Honorable James P. Churchill, Senior United States District Judge for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 15 U.S.C. Sec. 78j
 
 
 [2]
 17 C.F.R. Sec. 240.10b-5
 
 
 [3]
 Prior to Lampf, the Kentucky Blue Sky law provided a three year limitation period for this type of Federal securities action, running from the date of discovery. Ky.Rev.Stat.Ann. Sec. 292.480. Two Circuits had already adopted the Federal one year/three year period adopted in Lampf; others had applied State limitations periods. See Lampf, --- U.S. at ---- n. 1, 111 S.Ct. at 2777 n. 1 (citing cases)
 
 
 [4]
 The Supreme Court announced its decision in Lampf on June 20, 1991
 
 
 [5]
 Also known as "Section 27A." Subsection (a) of this provision retroactively applies the previously applicable statute of limitations to those cases filed before June 19, 1991 which remained pending in the courts. The parties do not dispute this subsection; we therefore do not address it
 
 
 [6]
 See Gordon S. Wood, Creation of the American Republic 154-55 (1969); Judicial Action by the Provincial Legislature of Massachusetts, 15 Harv.L.Rev. 208 (1901-02)
 
 
 [7]
 See, for example, Creation, supra note 6 at 154 ("[T]he assemblies in the eighteenth century still saw themselves ... as a kind of medieval court making private judgments as well as public law.... Such assumptions of traditional gubernatorial and judicial authority ... did not seem to be usurpations...."); see also E.S. Corwin, 1 Corwin on the Constitution 59-60 (1981)
 
 
 [8]
 Wood, supra note 6 at 404-07, 454. As an example, Professor Wood describes the problem which persisted in Vermont at this time:
 The legislature, charged the Vermont Council of Censors, was reaching for "uncontrolled dominion" in the administration of justice: becoming a court of chancery in all cases over pounds sterling4,000, interfering in causes between parties, reversing court judgments, staying executions after judgments, and even prohibiting court actions involving bonds or debts, consequently stopping nine-tenths of all causes in the state. In their assumption of judicial power the legislators had determined every cause, said the Council, guided by no rules of law but only by their crude notions of equity, "or in other words, according to their sovereign will and pleasure."
 Id. at 407 (quoting Address of the Council of Censors, Feb. 14, 1786, in Slade, ed., Vermont State Papers at 537).
 
 
 [9]
 The U.S. Attorney General then brought a motion for a writ of mandamus before the Supreme Court at its next term, which the Court denied since the motion was made ex officio rather than on behalf of an actual petitioner. Unfazed, the Attorney General subsequently brought another motion for a writ of mandamus, this time on behalf of a particular applicant, William Hayburn, and asked the Supreme Court to order the courts to entertain the veterans' applications. The Court issued an opinion declaring that it would hold the motion under advisement until the next term; by that time, however, Congress had enacted an alternative system for providing the pensions. See Hayburn's Case, 2 U.S. at 409
 
 
 [10]
 These letters, along with the opinion of the New York circuit panel, were published as a note to the Supreme Court's opinion issued in response to the Attorney General's second mandamus motion. While the Court did not specifically pass on the constitutionality of the act, as explained in note 9, the opinions rendered in Hayburn's Case "have since been taken to reflect a proper understanding of the role of the Judiciary under the Constitution." Morrison v. Olson, 487 U.S. 654, 677 n. 15, 108 S.Ct. 2597, 2612 n. 15, 101 L.Ed.2d 569 (1988)
 
 
 [11]
 Excepting, of course, the various courts which have found Sec. 27A constitutional. See, e.g., TGX Corp. v. Simmons, 997 F.2d 39 (5th Cir.1993); Cooke v. Manufactured Homes, Inc., 998 F.2d 1256 (4th Cir.1993); Cooperativa de Ahorro y Credito Aguada v. Kidder, Peabody & Co., 993 F.2d 269 (1st Cir.1993); Berning v. A.G. Edward & Sons, Inc., 990 F.2d 272 (7th Cir.1993); Gray v. First Winthrop Corp., 989 F.2d 1564 (9th Cir.1993); Anixter v. Home-Stake Production Co., 977 F.2d 1533 (10th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 1841, 123 L.Ed.2d 467 (1993); Henderson v. Scientific-Atlanta, 971 F.2d 1567 (11th Cir.1992), petition for cert. filed, June 25, 1993. Insofar as these courts have specifically addressed Sec. 27A(b) rather than placing a blanket imprimatur on Sec. 27A in its entirety, these opinions generally reflect the view that in enacting subsection (b), Congress simply acted within its powers to "change the underlying law" and apply the change retrospectively. We strongly disagree with the rationale behind these decisions, but we will refrain from critiquing each of them point by point; we believe our reasoning speaks for itself. Of course, we are also well aware of the multitude of District Court opinions on the subject
 
 
 [12]
 See also McCullough v. Commonwealth of Virginia, 172 U.S. 102, 19 S.Ct. 134, 43 L.Ed. 382 (1898), in which the Court reviewed a Virginia statute which effectively nullified bonds issued by the Commonwealth. State and Federal courts had previously adjudged the bonds to be fully negotiable. The Court held, among other things, that
 [i]t is not within the power of a legislature to take away rights which have been once vested by judgment. Legislation may act on subsequent proceedings, may abate actions pending, but when those actions have passed into judgment the power of the legislature to disturb the rights created thereby ceases.
 McCullough, 172 U.S. at 123-24, 19 S.Ct. at 142. The Government asserts that McCullough, which the District Court cited in holding Sec. 27A(b) to be unconstitutional, was the only occasion where the Supreme Court held a statute unconstitutional under the "vested rights doctrine." Even if this be the case, we confess ignorance of the rule implied in the Government's argument that a single, unreversed decision of the Supreme Court is not binding on the District Court, or on us. We do not base our decision primarily on this so-called "vested rights doctrine," despite its prominent separation of powers component, because the asserted ability of Congress to disturb rendered final judgments does not hinge on the nature of the judgment and its property value to the prevailing litigant, a central rationale of the vested rights doctrine. However, we note that McCullough remains good law, including the holding quoted above, even if the Supreme Court has not ruled on a similar case since. See Georgia Ass'n of Retarded Citizens v. McDaniel, 855 F.2d 805, 810 (11th Cir.1988); Daylo v. Administrator of Veterans' Affairs, 501 F.2d 811, 816 (D.C.Cir.1974).
 
 
 [13]
 As proof that no judgments are truly "final," shareholders and the Government point to Fed.R.Civ.P. 60(b), which allows a court the discretion to "relieve a party ... from [a] final judgment" it has previously rendered, on motion from a party, where any or all of a number of factors, such as mistake, fraud, or new evidence, show that the original judgment was somehow tainted or unfair. This argument completely misses the crucial point that Rule 60(b) in no way threatens judicial autonomy or implicates the separation of powers. The question is not whether the courts may disturb final judgments, but whether Congress may disturb them. See Treiber v. Katz, 796 F.Supp. 1054, 1062 n. 7 (E.D.Mich.1992) ("[T]he Court's authority to set aside its own final judgment ... is profoundly different from a legislative decree requiring courts to set aside final judgments."). To put this irresponsible argument in proper perspective, surely the Government would not argue that just because the Supreme Court can nullify legislation by declaring it to be violative of the Constitution, so can the President
 
 
 [14]
 United States v. Klein, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1871) established the rule that Congress cannot "prescribe a rule for the decision of a cause in a particular way." Klein, 80 U.S. at 146. After the Civil War, citizens of the former Confederacy could petition the Court of Claims under a 1863 law for a return of property, or proceeds therefrom, confiscated by Federal troops. The petitioners had to prove that they had not fought in the war, and had to prove their loyalty to the Union. Lincoln had issued a general pardon to any Southerner who swore loyalty to the Union. The Supreme Court held that a pardon served as sufficient proof of loyalty and noncombatant status. United States v. Padelford, 76 U.S. (9 Wall.) 531, 19 L.Ed. 788 (1869). In response to Padelford, Congress passed a new law which directed the Court of Claims to hold all such pardons inadmissible on behalf of the claimants for the purposes of these petitions; the possession of such a pardon would instead be deemed proof of disloyalty. Klein held the new law unconstitutional as a legislative subversion of the judicial function. While the Klein doctrine similarly protects the judiciary power from legislative encroachment, we believe Sec. 27A(b) forces the courts to rule again on cases they have dismissed with prejudice, not that it forces the courts to rule on those cases (or any cases) in a particular way. But see Henderson v. Scientific-Atlanta, 971 F.2d 1567, 1576 (Wellford, J., dissenting) (Section 27A violates Klein doctrine)
 
 
 [15]
 And, we note, correctly, according to Congress. In enacting Sec. 27A, Congress did not "change the underlying law" by repealing, amending or replacing the one year/three year time bar the Lampf Court derived from the securities laws, but eliminated only the applicability of that time bar, both to the claims asserted in Lampf itself and to all cases dismissed by the retroactive application of Lampf. This act of Congress does nothing more than command the courts to ignore (for a while) a valid judgment of the Supreme Court, adding salt to an already grievous wound
 
 
 [16]
 See, for example, the comments of Senator Bryan in support of Sec. 27A:
 The Supreme Court's decision in Lampf, June 20, 1991, in effect frees Michael Milken and scores of other felons and defendants of responsibility to pay back the people they have swindled. It would be a monstrous injustice that the icons of [g]reed in effect escape responsibility by reason of a Supreme Court decision that is given retroactive application. All we seek is to give the victims a fair day in court.
 
 
 [137]
 Cong.Rec. S18,624 (daily ed. Nov. 27, 1991)